# United States Court of Appeals
## For the Eighth Circuit
_____

No. 19-2206
_____

MPAY Inc.

*Plaintiff - Appellant*

v.

Erie Custom Computer Applications, Inc.; PayDay USA, Inc.; Payroll World, Inc.;
Proliant, Inc.; Proliant Technologies, Inc.; Kevin Clayton

*Defendants - Appellees*
_____

Appeal from United States District Court
for the District of Minnesota
_____

Submitted: June 17, 2020
Filed: August 14, 2020
_____

Before GRUENDER, WOLLMAN, and KOBES, Circuit Judges.
_____

GRUENDER, Circuit Judge.

MPAY Inc. appeals the district court's denial of its motion for a preliminary injunction against Erie Custom Computer Applications, Inc.; PayDay USA, Inc.; Payroll World, Inc.; Proliant, Inc.; Proliant Technologies, Inc.; and Kevin Clayton (collectively, "Appellees"). We affirm in part, vacate in part, and remand.

# I.

MPAY (formerly known as MATTPAY, Inc.) is a Massachusetts corporation that develops and owns payroll-processing software that it licenses to its customers. In 1999, MPAY entered into a Member Control Agreement with three other entities to form a new entity, OnePoint Solutions LLC. Under the Member Control Agreement, each separate entity became a member of OnePoint. Since that time, other entities joined OnePoint as members, including the entity Appellees.

Around the same time, MPAY entered into a Software Development and License Agreement with OnePoint. This agreement envisioned two phases in the relationship between MPAY and OnePoint. During "Phase One," MPAY would work with OnePoint to develop "Enhanced Software Products," meaning "modifications, enhancements, or improvements" of MPAY's payroll-processing software. In "Phase Two," OnePoint would "take over responsibility for support and development functions," and it would be free to "hire its own independent software developers to develop Enhanced Software Products" at that time. OnePoint would then own these "Phase Two Enhanced Software Products."

To allow OnePoint to develop its own Enhanced Software Products in Phase Two, the Software Development and License Agreement provided that MPAY would supply OnePoint with "complete copies of the source code" for MPAY's payroll-processing software. The source code is, as MPAY tells it, the "secret recipe" to the software—it is the computer text that gets "translated," so to speak, into the functional software products. Given the sensitive and proprietary nature of the source code, the agreement required each party to safeguard it.

In the Software Development and License Agreement, MPAY also granted OnePoint "a perpetual, non-exclusive, . . . and unrestricted right to use" MPAY's payroll-processing software "for its business, the business of any of the Members" of OnePoint, "or the business of any third party." In the Member Control Agreement, OnePoint, in turn, granted to each member of OnePoint a license to use

both MPAY's software and whatever software OnePoint developed. The Member Control Agreement also permitted certain members to sublicense the software "to any entity in which such Member owns (a) a majority of the value of the equity and (b) voting control." The Member Control Agreement otherwise prohibited members from sublicensing the software.

In 2003, MPAY and OnePoint executed a Letter Agreement to "clarif[y] the terms under which [MPAY] w[ould] provide Source Code" to OnePoint pursuant to the Software Development and License Agreement. In this Letter Agreement, MPAY and OnePoint reaffirmed that OnePoint could hire third parties to assist it with developing Phase Two Enhanced Software Products and, in doing so, could grant these third parties "access to the Source Code." OnePoint had to comply with certain "restrictions," however, before it granted third parties such access.

It appears that by 2007, MPAY had failed to fulfill its obligations to furnish OnePoint with the source code, so OnePoint sued MPAY. That litigation resulted in a Mediated Settlement Agreement. Among other things, the Mediated Settlement Agreement provided that Phase Two would begin in February 2008 and that most of OnePoint's obligations "arising out of" the Software Development and License Agreement would be extinguished at that time, with the caveat that MPAY retained its rights in its software products.

The instant action arose when MPAY evidently learned that OnePoint, at the direction of its manager Kevin Clayton, allegedly "copied and distributed" the source code to certain OnePoint members and that some members had sublicensed MPAY's software to third parties in whom no member held a majority equity stake. Believing these actions to be a violation of its intellectual-property rights, MPAY sued Clayton along with a number of entities who are current or former members of OnePoint. MPAY asserted a variety of claims against Appellees, including a copyright-infringement claim under federal law and trade-secrets-misappropriation claims under state and federal law. MPAY also sought a preliminary injunction,

asserting it was entitled to such relief based on its copyright-infringement and trade-secrets-misappropriation claims.

The district court denied this motion. It reasoned that the Software Development and License Agreement permitted OnePoint to provide the source code to its independent software developers in Phase Two, and it found that OnePoint's copying and distribution of the source code was simply the result of OnePoint exercising this right under the Software Development and License Agreement. It thus concluded that MPAY's claims of copyright infringement and trade secrets misappropriation premised on the unauthorized copying and distribution of the source code were unlikely to succeed. The district court did not address MPAY's claim that certain members of OnePoint were sublicensing MPAY's software in violation of the Member Control Agreement.

MPAY appeals this denial of its motion for a preliminary injunction. We have jurisdiction. *See* 28 U.S.C. § 1292(a)(1).

## II.

A "preliminary injunction is an extraordinary remedy," and the "party seeking injunctive relief bears the burden of proving" that the relevant factors "weigh in its favor." *Mgmt. Registry, Inc. v. A.W. Cos.*, 920 F.3d 1181, 1183 (8th Cir. 2019). "A plaintiff seeking a preliminary injunction must establish" four factors showing such relief is warranted: (1) "he is likely to succeed on the merits"; (2) "he is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in his favor"; and (4) "an injunction is in the public interest." *Wise v. Dep't of Transp.*, 943 F.3d 1161, 1165 (8th Cir. 2019). "While 'no single factor is determinative,' the probability of success factor is the most significant." *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (citation omitted) (quoting *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc)).

"We review a district court's ultimate ruling on a preliminary injunction for abuse of discretion, though we review its underlying legal conclusions de novo." *Home Instead, Inc.*, 721 F.3d at 497. "A district court abuses its discretion in denying a preliminary injunction if it rests its conclusion on clearly erroneous factual findings or erroneous legal conclusions." *Id.* (internal quotation marks omitted). Here, the district court's decision rested almost entirely on its interpretation of the agreements governing the parties' relationship, a question of law we review *de novo*. *See Lawn Managers, Inc. v. Progressive Lawn Managers, Inc.*, 959 F.3d 903, 912 (8th Cir. 2020). Our analysis of this issue is governed by Minnesota law given the Minnesota choice-of-law provisions in the relevant agreements, the application of which no party disputes. *See Progressive N. Ins. v. McDonough*, 608 F.3d 388, 390 (8th Cir. 2010) (applying Minnesota law because Minnesota was the forum state "and neither party has raised a choice-of-law claim").

MPAY advances two legal theories—copyright infringement and trade secrets misappropriation—under which it argues it is likely to succeed. It also advances two factual predicates giving rise to its claims: the allegedly wrongful copying and distribution of the source code and the allegedly improper sublicensing of MPAY's software. We first address the source-code issue; then, we turn to the improper-sublicensing issue.

A.

1.

Concerning the source-code issue, we start with the first and "most significant" factor, which is whether MPAY has shown a likelihood of success on the merits. *See Home Instead, Inc.*, 721 F.3d at 497. Appellees acknowledge that Erie Custom Computer Applications at least, and possibly also Proliant Technologies, possesses the source code. Declarants for Appellees have stated that these entities possess the source code only because OnePoint retained them as "independent software developers" to assist it in developing Phase Two Enhanced

Software Products. MPAY argues that these entities are not authorized to possess the source code. MPAY thus contends the copying and disclosure of the source code to these entities constitutes copyright infringement and that Clayton, Erie Custom Computer Applications, and Proliant Technologies have misappropriated MPAY's trade secrets through this arrangement. Although the legal theories MPAY has advanced differ in details, what MPAY must show to demonstrate a likelihood of success under either theory is ultimately the same: OnePoint did not have authorization to copy and disclose the source code to Erie Custom Computer Applications and Proliant Technologies, who in turn were not permitted to possess it.

To demonstrate copyright infringement, MPAY must show that it owned a valid copyright and that Appellees violated MPAY's copyright "by, for example, unauthorized reproduction and distribution of the copyrighted work." *See Pinkham v. Sara Lee Corp.*, 983 F.2d 824, 830 (8th Cir. 1992); *see also Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 51 (2d Cir. 2003) ("In a copyright infringement case, the plaintiff must show: (i) ownership of a valid copyright; and (ii) unauthorized copying of the copyrighted work."). Appellees do not dispute MPAY's copyright in the source code. Thus, MPAY's copyright-infringement claim turns on whether whatever copying and distribution Appellees have done was in fact unauthorized.

To demonstrate misappropriation of trade secrets, MPAY must show, among other things, the existence of a protectable trade secret and misappropriation of that trade secret. *See Phyllis Schlafly Revocable Tr. v. Cori*, No. 4:16CV01631 JAR, 2016 WL 6611133, at *2 (E.D. Mo. Nov. 9, 2016) (identifying the elements of misappropriation of trade secrets under the federal Defend Trade Secrets Act ("DTSA"), *see* 18 U.S.C. § 1836 *et seq.*); *accord Goodbye Vanilla, LLC v. Aimia Proprietary Loyalty U.S. Inc.*, 304 F. Supp. 3d 815, 820 (D. Minn. 2018) (identifying the elements of misappropriation of trade secrets under the Minnesota Uniform

Trade Secrets Act ("MUTSA"), *see* Minn. Stat. § 325C.01 *et seq.*).[1] Appellees do not dispute that the source code constitutes a protectable trade secret of MPAY's. Thus, MPAY's claim here turns on whether the source code has been misappropriated. "Misappropriation" can occur in various ways, including, as relevant here: (1) "acquisition of a trade secret . . . by a person who knows or has reason to know that the trade secret was acquired by improper means," such as "breach . . . of a duty to maintain secrecy"; or (2) "disclosure . . . of a trade secret of another without express or implied consent by a person who . . . at the time of disclosure . . . knew or had reason to know that the knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret . . . ." 18 U.S.C. § 1839(5)-(6); *accord* Minn. Stat. § 325C.01, subds. 2-3. Under the first definition of "misappropriation," MPAY must show Erie Custom Computer Applications and Proliant Technologies misappropriated MPAY's trade secrets by acquiring the source code while knowing that OnePoint breached its duty to maintain secrecy by disclosing the source code to them. Under the second definition of "misappropriation," MPAY must show Clayton misappropriated MPAY's trade secrets by disclosing the source code to Erie Custom Computer Applications and Proliant Technologies without MPAY's consent, thereby breaching OnePoint's duty to maintain the secrecy of the source code.

The district court concluded that MPAY did not show a likelihood of success on the merits under either legal theory, reasoning that the Software Development and License Agreement "allows OnePoint to develop 'enhanced software

---

[1]MPAY asserts claims for misappropriation of trade secrets under both the DTSA and the MUTSA. MPAY does not identify any differences in these statutes or in the construction courts have given them that would be relevant to our analysis, so we analyze MPAY's trade-secrets-misappropriation claims together. *See Cambria Co. v. Schumann*, No. 19-CV-3145 (NEB/TNL), 2020 WL 373599, at *3 (D. Minn. Jan. 23, 2020) (analyzing together claims asserted separately under the DTSA and the MUTSA "because the statutes have the same purpose and functionally the same definitions for key terms like 'trade secret,' 'misappropriation,' and 'improper means'").

products,'" which "must necessarily entail providing the source code to others." We agree.

In interpreting a contract governed by Minnesota law, we "must consider the overall purpose of the contract, as well as its terms." *Advantage Consulting Grp., Ltd. v. ADT Sec. Sys., Inc.*, 306 F.3d 582, 585 (8th Cir. 2002) (citing *Clapp v. Haferman Water Conditioning, Inc.*, 380 N.W.2d 838, 841 (Minn. Ct. App. 1986)). The Software Development and License Agreement authorized OnePoint in Phase Two to "hire its own independent software developers to develop Enhanced Software Products." "Enhanced Software Products" are "modifications, enhancements, or improvements of one or more of the Software Products," and "Software Products" are defined as MPAY's payroll-processing software "together with all Documentation and media" related to that software. Reading these provisions together, it is evident that the Software Development and License Agreement authorized OnePoint to develop new software by modifying the source code and to hire others to assist it in doing so, which, as the district court logically concluded, would "necessarily entail providing the source code to others." This reading of the Software Development and License Agreement is confirmed by the Letter Agreement, which recognized that OnePoint's development of Enhanced Software Products in Phase Two would entail "granting Contractors access to the Source Code" and "disclos[ing] the Source Code" to them. Indeed, MPAY even concedes that "OnePoint may provide source code to contractors to develop the Phase Two Enhanced Software Products."

Appellees aver that this is all they have done. OnePoint retained Erie Custom Computer Applications and Proliant Technologies as "independent software developers" to assist in developing Enhanced Software Products. Under the Software Development and License Agreement, OnePoint was thus authorized to disclose the source code to them. This authorization defeats both of MPAY's legal theories. Because the copying and disclosure of the source code was authorized, MPAY's copyright-infringement claim fails. *See Wu v. Pearson Educ. Inc.*, No. 10 Civ. 6537 (KBF), 2013 WL 145666, at *4 (S.D.N.Y. Jan. 11, 2013) ("A claim for

infringement will fail if the challenged use of the copyrighted work is authorized by a license." (citing *Graham v. James*, 144 F.3d 229, 236 (2d Cir. 1998))). And because Clayton's disclosure of the source code to those entity Appellees that OnePoint retained as its independent software developers was authorized, it did not amount to trade secrets misappropriation either for Clayton to disclose the source code to those entity Appellees, *see* 18 U.S.C. § 1839(5)(B) (stating that "misappropriation" means "disclosure . . . without express or implied consent"); *accord* Minn. Stat. § 325C.01, subd. 3(ii), or for those entity Appellees to acquire it, *see Babcock & Wilcox Co. v. Areva NP, Inc.*, 788 S.E.2d 237, 260 (Va. 2016) (recognizing that, under Virginia's materially identical Uniform Trade Secrets Act, "[t]here can be no misappropriation where acquisition . . . of a trade secret ha[s] been expressly authorized by contract").

MPAY resists this conclusion, arguing that "nothing in the record" besides "a couple of self-serving statements in declarations" shows that OnePoint hired Erie Custom Computer Applications and Proliant Technologies as independent software developers to assist it with developing Enhanced Software Products. MPAY goes even further, in fact, charging Appellees with having "fabricated this excuse." MPAY's contention is based on the fact that OnePoint has not shown it complied with the "restrictions" in the Letter Agreement that qualified OnePoint's ability to disclose the source code to others, such as the requirements that OnePoint notify MPAY in writing before disclosing the source code to others and that the independent software developers had to sign confidentiality agreements before OnePoint could disclose the source code to them. MPAY's argument is misplaced.

In the Mediated Settlement Agreement, MPAY and OnePoint agreed that, effective February 5, 2008, "all obligations arising out of the [Software Development and License] Agreement[] shall cease," subject to a few carveouts not relevant here. The "restrictions" in the Letter Agreement arose out of the Software Development and License Agreement, as the Letter Agreement was executed to "clarif[y] . . . matters contained in the [Software Development and] License Agreement." Thus, after February 5, 2008, OnePoint had no obligation to comply

with the "restrictions" in the Letter Agreement. The fact that OnePoint did not abide by obligations it was no longer bound by is not, as MPAY insists, proof that Appellees lied to the district court.

Furthermore, the "self-serving statements" of which MPAY complains are declarations made under penalty of perjury. They thus constitute record evidence that OnePoint did in fact hire Erie Custom Computer Applications and Proliant Technologies as its independent software developers. *See* 28 U.S.C. § 1746 (permitting unsworn declarations made under penalty of perjury to be submitted as evidence to prove a matter); *cf. Hill v. Kan. City Metro Task Force*, 182 F. App'x 620, 621-22 (8th Cir. 2006) (per curiam) (noting that court filings submitted under § 1746 were sufficient to create a dispute of fact so as to prevent summary judgment). Against these declarations, MPAY offers us only its bald assertions that Appellees' averments are "fabricated." We are unpersuaded by MPAY's evidence-free accusations of perjury.

Appellees demonstrated that their copying, disclosure, and possession of the source code were authorized by the Software Development and License Agreement. MPAY thus has not shown a likelihood of success on the merits of its copyright-infringement or trade-secrets-misappropriation claims, and the district court did not err in so concluding. This conclusion "strongly suggests" that the district court did not abuse its discretion in denying preliminary injunctive relief. *See D.M. ex rel. Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 999 (8th Cir. 2019). Nevertheless, mindful that no single preliminary injunction factor is "determinative," *id.*, we consider the remaining factors, *see also Sanborn Mfg. Co. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 486 (8th Cir. 1993) ("[A]ll of the factors must be considered to determine whether the balance weighs towards granting the injunction.").

2.

MPAY argues the district court erred in three respects in concluding MPAY had not shown irreparable harm regarding its source-code claim. First, MPAY maintains it was entitled to a presumption of irreparable harm under circuit law. Second, MPAY contends it made a sufficient "evidentiary showing" of irreparable harm even if it was not entitled to such a presumption. Third, MPAY asserts the district court erroneously concluded MPAY's harms were compensable with money damages and so were not irreparable. These contentions lack merit.

With respect to MPAY's first argument, the law in our circuit used to be that "[i]n copyright-infringement cases, . . . a showing of a *prima facie* case raises a presumption of irreparable harm." *Taylor Corp. v. Four Seasons Greetings, LLC*, 315 F.3d 1039, 1041-42 (8th Cir. 2003). Due to intervening Supreme Court decisions, however, it is "unclear" if this presumption is still good law. *See Phyllis Schlafly Revocable Tr. v. Cori*, 924 F.3d 1004, 1009 (8th Cir. 2019) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008), and *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391-94 (2006)). We need not decide this issue because, as discussed above, MPAY has failed to make a *prima facie* case of copyright infringement.[2] Therefore, it is not entitled to any presumption of irreparable harm.

---

[2]That said, district courts in our circuit have understandably declined to treat the presumption as good law. *See, e.g.*, *Cy Wakeman, Inc. v. Nicole Price Consulting, LLC*, 284 F. Supp. 3d 985, 994 n.5 (D. Neb. 2018); *Se. X-Ray, Inc. v. Spears*, 929 F. Supp. 2d 867, 872 (W.D. Ark. 2013). We adopted the presumption in *West Publishing Co. v. Mead Data Central, Inc.*, relying on a Third Circuit decision to find a "general rule" in copyright-infringement cases "that a showing of a *prima facie* case raises a presumption of irreparable harm." 799 F.2d 1219, 1229 (8th Cir. 1986) (citing *Apple Comput., Inc. v. Franklin Comput. Corp.*, 714 F.2d 1240, 1254 (3d Cir. 1983)). The *Apple Computer* court, in turn, cited decisions from the Seventh and Second Circuits in support of this proposition. *See* 714 F.2d at 1254 (citing *Atari, Inc. v. N. Am. Philips Consumer Elecs. Corp.*, 672 F.2d 607, 620 (7th Cir. 1982), and *Wainwright Secs. Inc. v. Wall St. Transcript Corp.*, 558 F.2d 91, 94 (2d Cir. 1977)). All three of these circuits have since recognized that the

As to MPAY's second argument, we fail to see how MPAY made a sufficient evidentiary showing of irreparable harm. For instance, without citing to anything in the record, MPAY asserts that harm to its "goodwill and reputation is inevitable." But "[s]peculative harm does not support a preliminary injunction." *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 779 (8th Cir. 2012). MPAY's uncorroborated claim that these harms are inevitable does not satisfy MPAY's burden to show irreparable harm. *See Chlorine Inst., Inc. v. Soo Line R.R.*, 792 F.3d 903, 915 (8th Cir. 2015) (noting that "[a]ppellants' assertion" that a harm would "inevitably result" was "too speculative" and thus insufficient to show irreparable harm).

MPAY also contends it has shown irreparable harm flowing from the "irreversible disclosure" of the source code, but this assertion fares no better. MPAY raises the specter that OnePoint has disclosed the source code to "unauthorized and unlicensed users" and that it is "impossible to determine" to whom the source code has been disclosed. According to MPAY, counsel for Appellees admitted to this wrongful disclosure during a 2018 phone conversation with MPAY's counsel. Counsel for Appellees denied he ever made such a statement. Furthermore, OnePoint's manager as well as officers from some of the entity Appellees have averred that the source code has not been disclosed to any other entity besides those that OnePoint has retained to assist it in developing Enhanced Software Products. As noted above, such disclosure was authorized. MPAY offers nothing in response to these averments except speculation about "possible" impermissible "onward distribution" of the source code. But "[m]erely demonstrating the possibility of harm is not enough" for MPAY to carry its burden to show irreparable harm. *See id.* at 915 (internal quotation marks omitted).

---

presumption is no longer good law. *See TD Bank N.A. v. Hill*, 928 F.3d 259, 279 (3d Cir. 2019); *Flava Works, Inc. v. Gunter*, 689 F.3d 754, 755 (7th Cir. 2012); *Salinger v. Colting*, 607 F.3d 68, 75, 79-80 (2d Cir. 2010).

MPAY's third argument—that its lost customers and lost profits are "impossible to calculate" and thus irreparable—is undermined by its own Statement of the Case. There, MPAY identifies "three longtime customers" it has lost and "estimates that business lost from those customers alone will total approximately $580,000 annually." By MPAY's own admission, then, it appears that any harm it may suffer in the form of lost customers and lost profits is quantifiable and compensable with money damages accordingly, meaning this harm is not irreparable. *See Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009).

3.

In balancing the equities, we weigh "the threat of irreparable harm" shown by the movant against "the injury that granting the injunction will inflict on other parties litigant." *Dataphase Sys.*, 640 F.2d at 113. As discussed in the previous section, MPAY has failed to show any irreparable harm. Balanced against this, as the district court noted, is the "significant harm" Appellees have declared they will suffer if an injunction were to issue, as an injunction would "prevent[] them from using the software that forms the basis of their businesses." MPAY has thus failed to show the balance of equities tips in its favor.

MPAY asserts Appellees' potential harms should not be weighed in the balance because they are "willful infringer[s]," *see Helene Curtis Indus., Inc. v. Church & Dwight Co.*, 560 F.2d 1325, 1333-34 (7th Cir. 1977), but MPAY has failed to show Appellees infringed MPAY's copyright, as discussed above. MPAY also contends the district court should not have credited Appellees' declarations about their potential harms. MPAY, however, offers little more than its own incredulity regarding some assertions in the declarations, and this is insufficient to instill in us a "definite and firm conviction" that the district court clearly erred by crediting these declarations. *See United States v. Haynes*, 958 F.3d 709, 714 (8th Cir. 2020). This argument therefore also lacks merit.

-13-

4.

Finally, MPAY argues the district court erred in concluding that granting an injunction would not serve the public interest, which error was derivative of its erroneous conclusion that MPAY failed to show a likelihood of success on the merits. As we have rejected the premise of MPAY's argument, we also reject MPAY's contention that the public interest would be served by an injunction. In fact, the public interest is better served by denying an injunction given that OnePoint simply exercised its rights under the Software Development and License Agreement in copying the source code and disclosing it to those Appellees it retained as independent software developers. *See Ride the Ducks of Phila., LLC v. Duck Boat Tours, Inc.*, 138 F. App'x 431, 434-35 (3d Cir. 2005) ("The public has a strong interest in seeing that contract . . . rights are respected."); *see also N.I.S. Corp. v. Swindle*, 724 F.2d 707, 710 (8th Cir. 1984) (noting that "the public interest calls for the[] enforcement" of valid contracts).

5.

In sum, MPAY has failed to show a likelihood of success on the merits concerning its source-code claim, which by itself "strongly suggests that preliminary injunctive relief should be denied." *D.M. ex rel. Bao Xiong*, 917 F.3d at 999. Additionally, none of the three other factors favor granting MPAY preliminary injunctive relief as to this issue. The district court thus did not abuse its discretion in denying MPAY's motion for a preliminary injunction on this issue, and we affirm this aspect of its Order and Judgment.

B.

MPAY also argues that Erie Custom Computer Applications and Payroll World wrongfully sublicensed use of MPAY's software to a third-party entity in which neither of them individually held a majority equity stake and possessed voting control, in violation of the sublicensing provision of the Member Control

Agreement. Although MPAY raised this argument before the district court, the district court did not address it in the court's Memorandum and Order denying MPAY's preliminary injunction motion.

"[W]e are a court of appellate review, 'not of first view.'" *Fru-Con Constr. Corp. v. Controlled Air, Inc.*, 574 F.3d 527, 540 (8th Cir. 2009) (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 718 n.7 (2005)). Furthermore, remand is ordinarily the appropriate course of action when "it would be beneficial for the district court to consider an . . . argument in the first instance." *Alexis Bailly Vineyard, Inc. v. Harrington*, 931 F.3d 774, 780 (8th Cir. 2019); *see also Fergin v. Westrock Co.*, 955 F.3d 725, 730 n.3 (8th Cir. 2020) ("When a district court fails to address a matter properly presented to it, we ordinarily remand to give the court an opportunity to rule in the first instance.").

Here, we find it would be beneficial to have the district court first address this issue given various "questions still to be resolved" concerning this claim. *See Schweiss v. Chrysler Motor Corp.*, 922 F.2d 473, 476 (8th Cir. 1990). Questions still to be resolved include: whether the sublicensed software is the same software in which MPAY holds a copyright; whether the sublicensing violates the terms of the Member Control Agreement prohibiting sublicensing except to an entity in which one OnePoint member holds a majority equity stake and has voting control; what harm (if any) befalls MPAY due to this sublicensing as well as whether any such harm is irreparable; whether the balance of equities tips in MPAY's favor; and whether the public interest would be served by an injunction prohibiting this ostensibly improper sublicensing. Therefore, although we agree with and affirm the district court's decision to deny preliminary injunctive relief regarding MPAY's source-code claim, we nevertheless vacate in part the district court's Order and Judgment denying that relief so that it may consider in the first instance whether a preliminary injunction against Erie Custom Computer Applications and Payroll World should issue. *Cf. Annex Med., Inc. v. Burwell*, 769 F.3d 578, 580, 582-83 (8th Cir. 2014) (vacating the denial of a preliminary injunction and remanding the case for the district court to conduct "additional analysis" of an unaddressed issue).

## III.

For the foregoing reasons, we affirm in part and vacate in part the Order and Judgment of the district court denying MPAY's motion for a preliminary injunction and remand this case for further proceedings consistent with this opinion.

_____