# United States Court of Appeals

### For the Eighth Circuit

_____

No. 17-3447

_____

Radiance Capital Receivables Eighteen, LLC

*Plaintiff - Appellee*

v.

Dr. Matthew Jerome Concannon

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Western District of Missouri - Jefferson City

_____

Submitted: December 11, 2018
Filed: April 4, 2019

_____

Before SMITH, Chief Judge, WOLLMAN and GRASZ, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Eleven years ago, Matthew Concannon, M.D., signed a general guaranty for a company that he thought he owned in part with his trusted friend and financial advisor. What his friend purportedly failed to mention in this otherwise routine exercise of obtaining his signature was that the guaranty would saddle Concannon with millions of dollars in debt from loans that his friend had obtained and was unable to repay. Concannon urges us to conclude that he was defrauded by his friend,

that his friend acted without his authority in delivering the guaranty to the bank, or that the bank's successor in interest, Radiance Capital Receivables (Radiance), lacks a proper chain of title to enforce the guaranty. The district court[1] determined that Concannon was liable, and we affirm.

## I.

Concannon graduated from medical school at the University of Missouri in 1987. After training in hand and microsurgery, he returned to the University to join the medical school faculty. There, Concannon retained the services of José Lindner[2] upon the suggestion of a faculty mentor. Lindner served as a financial planner and tax preparer for several prominent physicians in the area. The two became friends, and Concannon enlisted Lindner to advise him financially, prepare his taxes, and generally assist with his various business ventures.

Concannon left the University in late 2006, and Lindner assisted him in opening his own private medical practice shortly thereafter. Lindner handled the business's books and continued assisting with Concannon's tax and financial matters, including drafting and preparing the operating agreement for Concannon's holding company. Concannon trusted Lindner "more than [he could] describe" and gave Lindner complete access to his financial and business records. Concannon testified in an unrelated matter that, in his words, "I paid [Lindner] to act on my behalf. . . . As a matter of routine, I—when [Lindner] would give me stuff to sign, I would just sign it."

---

[1]The Honorable Nanette K. Laughrey, United States District Judge for the Western District of Missouri.

[2]Lindner passed away in 2010.

Lindner also managed his own commercial real estate developments, one of which involved an entity named Providence Farms, LLC (Providence). Lindner offered Concannon an opportunity to obtain a dollar-for-dollar tax credit by investing in Providence and its various infrastructure construction projects, and Concannon agreed to invest $600,000. Lindner handled Concannon's involvement with Providence and regularly sought his signature on related documents, including those purporting to add Concannon's holding company as a member of Providence with a 50% ownership interest. Concannon also signed guaranties permitting Lindner to obtain and renew, on Providence's behalf, millions of dollars in loans from various financial institutions.

Concannon signed a general guaranty for Providence on January 24, 2008. The document listed Premier Bank as the lender and guaranteed all of Providence's "present and future debts" of "every type, purpose and description," including, "without limitation, all principal, accrued interest, attorney's fees and collection costs." Unbeknownst to Concannon, Providence teetered on the brink of foreclosure at the time, and various banks had required Lindner to obtain guarantors and investors to keep Providence afloat. In subsequent years, Concannon also made personal loans to Lindner at the latter's request to enable Providence to make its loan payments. Concannon insisted on collateral for one such $240,000 loan in late 2009. Around that time, he attended two meetings between Premier Bank and Lindner, during which the bank informed Lindner that it needed payment on the loans.

Providence did not make its loan or interest payments and defaulted. The company and its projects were a sham; Concannon did not receive a tax credit or a membership interest, and the infrastructure projects which he purportedly funded with his investments in Providence were never constructed.

Premier Bank failed in 2010. The Federal Deposit Insurance Corporation (FDIC) took over its assets, which included the right to collect from Providence. The

FDIC created the entity CADC/RADC Venture 2011-1 (CADC), which the FDIC owned jointly with a private investment company, and sold Premier Bank's assets to it. CADC obtained a consent judgment against Providence in Missouri state court in September 2014 for $15.7 million plus interest. Concannon had been dismissed as a defendant in the state action, and he did not object to the consent judgment. CADC then sold Providence's debt obligations to Radiance in May 2016 and thereafter executed and filed an Assignment of Judgment in Missouri state court assigning the consent judgment against Providence to Radiance.

Radiance filed suit in federal district court against Concannon to collect the burgeoning amount owing from the consent judgment, which now approaches $22 million. Relevant here, Radiance claimed that Concannon breached his guaranty. The district court granted Radiance's summary judgment motion in part, concluding that Radiance had a valid assignment of Providence's debt. Following a bench trial in October 2017, the district court determined that Lindner had acted with Concannon's actual authority to deliver the signed guaranty to Premier Bank and that Concannon failed to establish a fraud-in-factum defense. The court ordered Concannon to pay the full amount owing on the consent judgment and granted Radiance's motion for attorneys' fees. After denying Concannon's request to amend the findings and judgment, the court entered final judgment. The parties agree that Missouri law applies in this diversity action.

II.

Concannon contends that Radiance lacks the right to enforce the consent judgment because the assignment of Providence's debt from the FDIC to CADC was invalid. As a party seeking to collect a debt owed another, Radiance must prove valid each assignment serving as a "link in the chain between the party to which the debt was originally owed and the party trying to collect the debt." CACH, LLC v. Askew, 358 S.W.3d 58, 62 (Mo. 2012). We review de novo the district court's determination

-4-

that the chain of assignments was valid.  Hanson v. FDIC, 113 F.3d 866, 869 (8th Cir. 1997) (standard of review).

Concannon claims that the FDIC exceeded its statutory authority by creating and co-owning CADC and by entering into structured transactions between CADC and private investors.  He contends that because the FDIC acted without authority in doing so, its transfer of Premier Bank's assets to CADC was void as a matter of law.

"[A]n agency may only exercise those powers Congress has given it."  Saxton v. Fed. Hous. Fin. Agency, 901 F.3d 954, 960 (8th Cir. 2018) (Stras, J., concurring). In response to the 1980s savings-and-loan crisis, Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA) to enable the FDIC to act as a receiver for failed institutions.  Pub. L. No. 101-73, 103 Stat. 183 (codified as amended in scattered sections of 12 U.S.C.).  FIRREA grants the FDIC "unprecedented powers so that it may function efficaciously as a receiver or conservator of insolvent financial institutions."  Sunshine Dev., Inc. v. FDIC, 33 F.3d 106, 111 (1st Cir. 1994); see also Hanson, 113 F.3d at 871 ("As a receiver, the FDIC has substantial powers over [a failed institution's] assets.").

We conclude that the FDIC's creation of CADC and its sale of Premier Bank's assets thereto fall within its broad power.  Under FIRREA, the FDIC has authority to act as a receiver, 12 U.S.C. § 1821(c)(2)(A)(ii), and to assume "all rights, titles, powers, and privileges of the insured depository institution," § 1821(d)(2)(A)(i). Accordingly, the FDIC was authorized to assume Premier Bank's right to collect Providence's debt.  Because the FDIC also had the authority under § 1821(d)(2)(E) to dispose of Premier Bank's assets, we conclude that it acted within its incidental powers when it created CADC and sold Premier Bank's assets to it.  Id. § 1821(d)(2)(G)(i)(II) (permitting the FDIC to transfer assets); § 1821(d)(2)(J)(i)-(ii) (permitting the FDIC to "exercise . . . such incidental powers as shall be necessary to carry out [specifically granted] powers" and "take any action authorized by this

chapter, which the [FDIC] determines is in the best interests of the depository institution, its depositors, or the [FDIC]").  Section 1821(d)(2)(K) authorized the FDIC to use the services of a private entity to dispose of Premier Bank's assets.  The district court therefore properly determined that the assignment of rights from the FDIC to CADC was valid.  Concannon does not dispute the validity of the assignment from CADC to Radiance, and thus we conclude that Radiance may enforce the consent judgment.

In so concluding, we reject Concannon's argument that the FDIC's incidental powers are limited to acts strictly necessary to dispose of the bank's assets.  His theory is not supported by case law, and a reasonable reading of FIRREA's text authorizes the FDIC to act as it did here.  We further reject Concannon's claim that § 1821(d)(2)(F)'s express grant of authority to organize depository institutions precludes the FDIC from creating non-depository entities like CADC.  Concannon's reading would frustrate both FIRREA's text, which permits the use of incidental powers, and its purpose, which grants the FDIC broad discretion to dispose of a failed institution's assets.  See Watt v. GMAC Mortg. Corp., 457 F.3d 781, 783 (8th Cir. 2006) ("[C]ourts will construe the details of an act in conformity with its dominating general purpose." (quoting Herman & MacLean v. Huddleston, 459 U.S. 375, 387 n. 23 (1983))).

III.

Concannon next argues that the district court erred in concluding that Lindner acted as his agent with implied actual authority when delivering the guaranty to Premier Bank.  See ITT Commercial Fin. Corp. v. Mid-Am. Marine Supply Corp., 854 S.W.2d 371, 382 (Mo. 1993) (explaining the unconditional delivery element of a breach of guaranty claim).  "Agency is the fiduciary relationship resulting from the manifestation of consent by an agent to a principal that the agent will act on the principal's behalf and subject to his control." Bach v. Winfield-Foley Fire Prot. Dist.,

257 S.W.3d 605, 608 (Mo. 2008). Whether this principal-agent relationship exists is generally a question of fact. See Bus. Bank of Saint Louis v. Old Republic Nat'l Title Ins. Co., 322 S.W.3d 548, 552 (Mo. Ct. App. 2010). Concannon does not seriously dispute the district court's finding that he and Lindner had such a relationship.[3]

Instead, he contends that Lindner delivered the guaranty without his authority and therefore acted outside the scope of any agency relationship. In the context of a principal-agent relationship, the principal is responsible for his agent's acts as long as the agent acts with actual or apparent authority. Id. Actual authority may be express or implied. Id. The former "exists when the principal explicitly tells the agent what to do," and the latter, implied actual authority, "consists of those powers incidental and necessary to carry out the express authority." Id. at 552, 554 (quoting Hardcore Concrete, LLC v. Fortner Ins. Servs., Inc., 220 S.W.3d 350, 355 (Mo. Ct. App. 2007)). "[T]he relationship of principal and agent cannot be presumed but must be proved," and thus, "[i]mplied powers, like any others, must be bottomed on some act or acquiescence of the principal, express or implied." Dudley v. Dumont, 526 S.W.2d 839, 843-44 (Mo. Ct. App. 1975). Whether an agent's actions were incidental and necessary to carry out the express authority is also a question of fact. See Bus. Bank of Saint Louis, 322 S.W.3d at 554.

Concannon argues that delivering the guaranty was not reasonably necessary to carry out any grant of express authority that he had given to Lindner to prepare various operating agreements, calculate his taxes, and take care of other business matters. However, the district court found that Concannon signed the guaranty and understood that he was signing it; that he had admitted in a prior deposition that he

---

[3]Concannon also does not dispute that Lindner physically delivered the guaranty to Premier Bank, nor that, if Lindner acted as his agent when delivering the guaranty, the delivery would be his act.

had paid Lindner to act on his behalf and had thought or assumed that Lindner acted on his behalf in giving him documents to sign; that he had relied on Lindner for various tax and financial services, particularly related to Providence Farms; and that he generally had relied on Lindner to take care of his business matters. Concannon does not dispute these findings. The record also indicates that Concannon testified that he and Lindner had previously discussed working together on a deal and that he had been "looking forward" to partnering with Lindner and investing in Providence. After signing the guaranty, Concannon twice accompanied Lindner to meetings with Premier Bank to discuss Providence's debt. Concannon also claimed $1,370,648 in nonpassive losses related to Providence during the tax years of 2007, 2008, and 2009. These facts support a determination that Concannon gave Lindner express authority to draft and execute all documents related to his involvement in Providence Farms; that Concannon's purpose in granting this express authority was both to obtain what he thought was a tax credit and to join Lindner in financing Providence's various infrastructure projects; and that securing guarantors to ensure Providence's continued operations was incidental to that express grant of authority. We thus conclude that the district court did not clearly err in determining that Lindner acted with implied actual authority in delivering the guaranty to Premier Bank on Concannon's behalf. See Wright v. St. Vincent Health Sys., 730 F.3d 732, 737 (8th Cir. 2013) (standard of review).

Concannon contends that the guaranty is nonetheless unenforceable because Premier Bank failed in its duty to ensure that Lindner acted with Concannon's authority when delivering the guaranty. See, e.g., Erickson v. Civic Plaza Nat. Bank, 422 S.W.2d 373, 380 (Mo. Ct. App. 1967) ("A third person dealing with an agent . . . has the duty of ascertaining for himself, the agent's authority."). Because Lindner acted with implied actual authority, Premier Bank would have found that Lindner was acting well within his scope of authority had it inquired. Its failure to so inquire does not relieve Concannon of liability. See Dalton & Marberry, P.C. v. NationsBank, N.A., 982 S.W.2d 231, 235 (Mo. 1998) ("In Missouri, a payee bank may avoid

liability by proving that the agent has actual or apparent authority from the drawer-depositor."); see also Luechtefeld v. Marglous, 151 S.W.2d 710, 716 (Mo. Ct. App. 1941) (determining that the plaintiff could "prove the authority of the agent Voss to deliver the note and deed of trust and collect the proceeds of said sale" by "showing implied or apparent authority."). To the extent that Concannon argues that Premier Bank had a special duty to inquire in the context of a loan guaranty, which he claims is akin to a contract offer, our conclusion is unchanged: any inquiry by Premier Bank would have revealed that Lindner acted with implied actual authority when delivering the guaranty.

IV.

Concannon disputes the district court's findings that Lindner did not misrepresent the guaranty and that Lindner was not his fiduciary in relation to Providence Farms. He also disputes the court's conclusion that he, Concannon, was generally negligent, all of which led it to reject his fraud in the factum defense. Such fraud is a misrepresentation as to the nature of the act being done; that is, "the fraud-feasor intends one thing and the victim intends another thing." Wolf v. St. Louis Pub. Serv. Co., 357 S.W.2d 950, 957 (Mo. Ct. App. 1962). A defendant seeking to invoke such a defense in Concannon's situation must show (1) that he signed a document in ignorance of its true character; and (2) that his act was due to misrepresentations or fraudulent conduct on the part of another party and not to his own negligence. Rau v. Robertson, 260 S.W. 751, 754 (Mo. 1924). Fraud in the factum voids a contract *ab initio*. Id. We review the district court's factual findings for clear error and its legal conclusions *de novo*. See Wright, 730 F.3d at 737. A factual finding is clearly erroneous "only if it is not supported by substantial evidence in the record, if it is based on an erroneous view of the law, or if we are left with the definite and firm conviction that an error was made." Id. (quoting Urban Hotel Dev. Co. v. President Dev. Grp., L.C., 535 F.3d 874, 879 (8th Cir. 2008)).

Concannon contends that he was deceived as to the true nature of the guaranty and instead believed it to be a "routine and necessary document related to a tax shelter." But the district court found as a fact that Concannon understood that he was signing a guaranty, which, if supported by substantial evidence, refutes his fraud defense and renders immaterial whether Lindner acted as his agent and whether Concannon was generally negligent. That is, if Concannon knew he was signing a guaranty for Providence's debts, he cannot have believed that his act was "of a different nature than what it really [wa]s." Wolf, 357 S.W.2d at 957 (determining that the plaintiff, induced to sign a release by false representations that his medical bills would nonetheless be paid, was not deceived as to the nature of the release and therefore stated a claim for fraud in the inducement, not fraud in the factum).

We conclude that the district court's finding is not clearly erroneous. Concannon read and sought legal advice regarding other documents Lindner prepared for him, including his holding company's operating agreement. He had signed other documentation in the past to assist Providence in securing loans. After signing the guaranty, he attended meetings between Premier and Lindner discussing Providence's debt. Moreover, the guaranty is unambiguous; the words "ALL PRESENT AND FUTURE DEBTS" appear on the first page, and Concannon signed below the clear label "GUARANTOR." In light of these facts, the court was free to reject Concannon's testimony that he did not understand the guaranty and would not have signed it if he had. The record is devoid of any evidence that Lindner concealed or otherwise misrepresented the guaranty. See Rau, 260 S.W. at 755. Any failure by Lindner to explain the full extent of the guaranty—that Concannon's signature would guarantee millions in loans that Lindner had already obtained on Providence's behalf—does not negate Concannon's knowledge of the "true character" of the guaranty. See id. at 754 (distinguishing fraud in the inducement, which "implies that plaintiff knew that the document embodied a contract of release, but that she was induced to sign it through the fraud of the defendant," from fraud in the factum, which implies that the plaintiff "believed [the instrument] to be of an entirely

different character"). Because the district court's factual finding that Concannon understood what he was signing and knew it to be a guaranty is supported by substantial evidence, Concannon's fraud in the factum defense necessarily fails.

The facts of this case are readily distinguishable from those on which Concannon relies. In Rau, for example, the defendant offered to pay Rau's lost wages after he had hit her with his car, causing her to miss work. He later visited her at the hospital and, while she was "weak and sick and nervous, and impatient to leave the hospital to go home," asked her to sign what he portrayed as a receipt for his payment of her wages. Id. at 755. He "folded it as to disclose to her merely the place of signature, concealing apparently even the heading: 'Release of Claim, Emma Rau against John M. Robertson.'" Id. Because Rau thought she was signing a receipt when she signed a release, and in spite of her choice not to read before signing, the court remanded for the jury to decide "whether through defendant's fraudulent conduct and representations she was led to sign without further investigation an instrument she did not intend to execute." Id. In contrast, the record here supports the district court's finding that Concannon knew that the instrument was a guaranty. Concannon also relies on language from Liddell v. Lee, 159 S.W.2d 769, 772 (Mo. 1942), which recognizes situations in which a fraud victim "impose[s] trust and confidence in the [fraud-feasor]." Nevertheless, the defense requires the victim to be deceived as to the type of document being signing or the terms therein, and Concannon was not.

The judgment is affirmed.

_____

-11-