# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 21-2496

———————————————

Wildhawk Investments, LLC

*Plaintiff - Appellee*

v.

Brava I.P., LLC; Billibob Boor; Paragon Roof Systems, LLC

*Defendants - Appellants*

Estate of Gerald E. Edson

*Defendant*

Donna Murphy; Gerald Edson

*Defendant*s

———————————————

Appeal from United States District Court
for the Southern District of Iowa - Central

———————————————

Submitted: January 12, 2022
Filed: February 23, 2022

———————————————

Before SMITH, Chief Judge, WOLLMAN and ERICKSON, Circuit Judges.

———————————————

ERICKSON, Circuit Judge.

Wildhawk Investments, LLC ("Wildhawk") initiated this breach of contract action against Brava I.P., LLC ("Brava I.P."), Paragon Roof Systems, LLC ("Paragon"), and Billibob Boor (collectively, "Paragon Defendants") for producing composite roofing shingles contrary to an exclusive license agreement. The district court entered a preliminary injunction prohibiting the Paragon Defendants from manufacturing or selling their products. The Paragon Defendants appeal, contending the district court misinterpreted the contract, erroneously rejected their equitable estoppel defense, and improperly found a threat of irreparable harm. We reverse and vacate the preliminary injunction.

## I.    BACKGROUND

Composite roof tiles are made with synthetic materials and imitate traditional barrel, shake, and slate shingles. Boor and Gerald Edson owned Brava I.P., through which they obtained patents, developed purported trade secrets, and gained technical knowledge related to the design and manufacture of composite roofing products.[1] Boor and Edson produced and sold composite shingles through a separate company, Brava Technologies, LLC, under the brand Brava Roof Tile.

Brava Roof Tile produces composite shingles in four styles: Brava Old World Spanish, Brava Shake, Brava Old World Slate, and Brava Slate. A unique colorization process allows Brava Roof Tile products to resemble their natural counterparts more closely than their competitors' products. Boor and Edson created the designs and manufacturing techniques by using their experience in the composite roofing industry.

Wildhawk approached Boor and Edson about purchasing Brava Roof Tile. In July 2015, Boor sent an email to Wildhawk member Adam Brantman proposing "an

---

[1]Edson passed away shortly after this lawsuit began and was dismissed as a defendant. His estate was named as a defendant after the district court issued the preliminary injunction, and it is not a party to this appeal.

exclusive license for manufacturing current roofing products." Boor specified that Wildhawk would "have a right of first refusal on all new product [d]evelopments." Brantman responded with a draft letter of intent reiterating that "Wildhawk would have a first right of refusal on new inventions and developments from Boor/Edson." Brantman characterized Wildhawk's offer as "what we believe is a fair price for the business as it exists today." Boor requested in another message, "Remove other compression mold products wording. This deal is for the four products only as discussed." Brantman sent back, "Agreed." The final nonbinding letter of intent, signed on July 14, 2015, included the first refusal language from the earlier draft.

On November 25, 2015, the parties executed asset purchase agreements and a license agreement. Wildhawk paid a total of almost $4 million for Brava Roof Tile's assets and for licenses to its patents, know-how, and intellectual property rights.

The license agreement granted Wildhawk "an exclusive, perpetual, license to use the Know-How in practicing the Patents or in the manufacturing of raw materials for the production of Licensed Products in accordance with the Manufacturing Guidelines and Conditions." Know-How included "all engineering, manufacturing data, formulas, designs, methods and processes, programs, listings, documentation and drawings, notes, flow charts, manuals, manufacturing aids, plans, technology, trade secrets, know-how, and other proprietary information licensed by Licensor and related to the Field of Use." Field of Use was defined as "the manufacture and sale of quality Roofing Shingles and the related accessories." Roofing Shingles meant "products used as roofing shingles and related materials and accessories including, as an example, the items shown in the list attached hereto as Exhibit A," which specifically identified the four existing Brava Roof Tile products. The agreement defined Licensed Products as "all quality Roofing Shingles and Related Materials products licensed for production herein or that, if unlicensed, would infringe or otherwise violate one or more claims of the Patents or utilizes the Know-How."

Moreover, the license agreement conferred on Wildhawk an automatic license to "any Improvements," defined as "improvements to the Technology, whether patentable or not, including any method, apparatus, design, component, system or device." Technology meant "the Patents and Know-How, collectively." Brava I.P., Boor, and Edson also warranted that the "Patents, Know-How and/or Intellectual Property Rights constitute all of the intellectual property used in or necessary to conduct the business of manufacturing and selling plastic roofing shingles as conducted and as currently planned to be conducted by Seller or any other entity owned and/or controlled by Seller."

A month before executing the license agreement, the parties agreed to remove a "New Product Applications" section due to requirements imposed by Wildhawk's lender. The deleted section read:

> In the event that Licensor develops new products under its rights to the Technology, Licensee will have forty five (45) calendar days upon being informed of the new product by Licensor in which Licensee may choose to itself seek to purchase a license to the product prior to Licensor's entering into a binding agreement with a third party purchaser or licensee.

Boor and Wildhawk acknowledge that despite removal of that language, they entered into an oral handshake agreement for a right of first refusal at the time they signed the license agreement.

Wildhawk achieved success after the acquisition, growing Brava Roof Tile's gross annual sales from approximately $1 million to $13 million in four years. None of Wildhawk's members had previous experience in the composite roofing industry. As a result, Wildhawk retained Boor and Edson as paid consultants subject to initial 18-month noncompete agreements. Brantman referred to Boor as "the most important person in the organization."

In August 2016, Boor sent an email to Wildhawk that began with, "As per our handshake agreement, Gerald and I would like to let you know of, and offer your group first right of refusal on the below products." Among the proposed products was "Platinum Tile," a design for composite shingles that would later become known as Natura shake. Boor followed up several months later with an outline of a research and development deal structure for Natura shake that suggested "[d]esign and IP rights will remain under Billibob and Gerald ownership until" reaching a $1 million royalty cap. He also mentioned duplicating the deal for a Natura slate design.

On May 5, 2017, Boor, Edson, and Wildhawk entered into a confidentiality and nondisclosure agreement ("NDA") regarding "possible R&D 'new or enhanced product' agreements." The NDA stated in part:

> As part of the [license agreement], it was agreed that Billibob Boor and Gerald Edson would give Recipient first right of refusal on all new R&D developments that they develop related to the composite roofing industry. This agreement was requested to be made a binding verbal agreement on or before November 2015, between Gerald Edson, Billibob Boor, and Wildhawk Investments LLC, due to restrictions on Recipients SBA financing requirements. Recipient understands that breaching this confidentiality agreement would be a breach of the [license agreement].

After signing the NDA, Wildhawk responded with a proposal to purchase the Natura shake design. Wildhawk offered an increased $1.5 million royalty cap and requested "a right of first refusal . . . for all future profile/product developments." A Wildhawk member boasted that "if this deal yields the type of success that both parties anticipate, there would be no reason to think that this deal couldn't serve as a framework . . . for subsequent deals including" additional composite shingle designs. The parties continued negotiations throughout late 2018 and early 2019 but failed to reach an agreement.

Boor and Edson formed Paragon in May 2019, while Boor was still employed as a consultant for Wildhawk. On August 18, 2019, Boor emailed Wildhawk with a final offer regarding the Natura designs. Boor stated that he and Edson had assessed what "we can make on our own over the next five years producing the materials ourselves while still owning the company and have settled on 10 million USD being the number for us to step away from that and to place the program in the hands of Wildhawk." The email concluded, "Time is of the essence. If we are going to work on a program and tie ourselves together [then] the time is now." Wildhawk never substantively responded to the offer.

In January 2020, Paragon began producing Natura products in barrel, shake, and slate styles. Ten months later, Wildhawk sued the Paragon Defendants in Iowa state court for breach of contract and other claims not relevant here. The Paragon Defendants removed the case to federal court. The district court granted Wildhawk's ensuing motion for a preliminary injunction and barred the Paragon Defendants from manufacturing or selling composite roofing products. This appeal followed.

## II.   DISCUSSION

We review the district court's grant of a preliminary injunction for abuse of discretion. Brakebill v. Jaeger, 932 F.3d 671, 676 (8th Cir. 2019). An abuse of discretion arises "when the district court relies on clearly erroneous factual findings or an error of law." Dixon v. City of St. Louis, 950 F.3d 1052, 1055 (8th Cir. 2020). The interpretation of a contract is a legal question reviewed *de novo*. Weitz Co. v. MacKenzie House, LLC, 665 F.3d 970, 975 (8th Cir. 2012).

A district court weighs four factors when deciding a motion for a preliminary injunction: "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 114 (8th Cir.

1981) (en banc). Likelihood of success on the merits is the most important factor, Craig v. Simon, 980 F.3d 614, 617 (8th Cir. 2020) (per curiam), and requires a movant to demonstrate at least a "fair chance of prevailing," Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs, 826 F.3d 1030, 1041 (8th Cir. 2016).

On appeal, the Paragon Defendants assert the district court erred in finding a likely breach of the license agreement, in rejecting their equitable estoppel defense, and in perceiving a threat of irreparable harm. We address each issue in turn.

## A.      License Agreement Breach

The Paragon Defendants principally dispute the district court's interpretation of the license agreement. "The cardinal rule of contract interpretation is to determine what the intent of the parties was at the time they entered into the contract." Pillsbury Co. v. Wells Dairy, Inc., 752 N.W.2d 430, 436 (Iowa 2008). The words of the contract provide "[t]he most important evidence of the parties' intentions at the time of contracting." Peak v. Adams, 799 N.W.2d 535, 544 (Iowa 2011). Iowa courts "also look to extrinsic evidence such as[] the situation and relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties." NevadaCare, Inc. v. Dep't of Hum. Servs., 783 N.W.2d 459, 466 (Iowa 2010) (cleaned up).

The license agreement's plain language belies the argument that Wildhawk purchased only the rights to manufacture and sell the four original Brava Roof Tile products. The contract partially defined Licensed Products as "all quality Roofing Shingles . . . that, if unlicensed, . . . utilizes the Know-How." And Roofing Shingles merely "include[ed], as an example," the four Brava Roof Tile products. Adopting the Paragon Defendants' interpretation would render those provisions meaningless. See Art Etc. LLC v. Angel Gifts, Inc., 686 F.3d 654, 657 (8th Cir. 2012) ("Iowa law strives to give effect to all language in a contract."). The broad language chosen to define key terms indicates the license extended to yet undeveloped products.

The Paragon Defendants next focus on the scope of the license being limited to the Know-How used "in practicing the Patents or in the manufacturing of raw materials for the production of Licensed Products in accordance with the Manufacturing Guidelines and Conditions." They contend that the Natura products fall outside the license because Wildhawk does not claim patent infringement or the impermissible manufacture of actual raw materials. Yet the word "manufacture" can mean "to work up *as* or convert *into* a specified product." Manufacture, n.2.a., Oxford English Dictionary Online, https://www.oed.com/view/Entry/113770 (last visited Feb. 10, 2022). Construing the license to cover the Know-How utilized in the working up or converting of raw materials for producing Licensed Products is consistent with the context surrounding the contract. During the preliminary negotiations, Boor proposed "an exclusive license for manufacturing . . . roofing products." Neither Wildhawk nor the Paragon Defendants manufacture the raw materials needed to produce composite shingles. In addition, the referenced Manufacturing Guidelines discuss the process for making finished composite roofing products. "Because an agreement is to be interpreted as a whole, . . . an interpretation which gives a reasonable, lawful, and effective meaning to all terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect." C & J Vantage Leasing Co. v. Wolfe, 795 N.W.2d 65, 77 (Iowa 2011) (citation omitted). When interpreted as a whole, the license agreement afforded Wildhawk a license to the Know-How used in producing composite shingles.

Finally, the Paragon Defendants claim that the NDA cleared the way for them to produce the Natura products. The NDA portrays the oral handshake agreement as a "first right of refusal on all new R&D developments . . . related to the composite roofing industry." Since the NDA retroactively describes what the parties allegedly agreed to at the time they executed the license agreement, it is not a modification of the original contract. Instead, the NDA is extrinsic evidence of a contemporaneous oral agreement. See Garland v. Branstad, 648 N.W.2d 65, 69 (Iowa 2002) (noting that the parol evidence rule affects "negotiations or agreements that are prior to or contemporaneous with the writing"). Under the parol evidence rule, "where there is

a binding agreement, either completely or partially integrated, evidence of prior or contemporaneous agreements or negotiations is not admissible in evidence to contradict a term of the writing." Restatement (Second) of Contracts § 215 (Am. L. Inst. 1981). The right of first refusal for all new product developments in the NDA contradicts the full ownership rights granted to Wildhawk in the license agreement. There is no dispute that the license agreement is partially integrated. The Paragon Defendants thus cannot rely on the NDA or any other extrinsic evidence to contradict its written terms. See Bartlett Grain Co. v. Sheeder, 829 N.W.2d 18, 24-25 (Iowa 2013) (rejecting extrinsic evidence that contradicted partially integrated agreement). The district court did not err when interpreting the license agreement.

The accompanying factual determinations that the Paragon Defendants likely breached the license agreement are supportable in the record. "A factual finding is clearly erroneous 'only if it is not supported by substantial evidence in the record, if it is based on an erroneous view of the law, or if we are left with the definite and firm conviction that an error was made.'" Radiance Cap. Receivables Eighteen, LLC v. Concannon, 920 F.3d 552, 559 (8th Cir. 2019) (quoting Wright v. St. Vincent Health Sys., 730 F.3d 732, 737 (8th Cir. 2013)).

Evidence from the preliminary injunction hearing illustrates that the Paragon Defendants manufactured the Natura products by using the Know-How exclusively licensed to Wildhawk. Testimony established that the Paragon Defendants utilize similar combinations of raw materials and a comparable manufacturing process to produce their composite shingles. Notably, Boor admitted that he and Edson tapped into the technical knowledge gained from developing the Brava Roof Tile products to invent the designs and manufacturing process for the Natura products. Wildhawk additionally held an automatic license in "improvements to [the Patents and Know-How, collectively]." An improvement ordinarily means "an addition or alteration by which the quality or standard of something is increased." Improvement, n.6.b., Oxford English Dictionary Online, https://www.oed.com/view/Entry/92858 (last visited Feb. 10, 2022). Boor testified he built upon the Brava Roof Tile products to

design the Natura products with enhanced installation, weight, colorization, strength, and watershed features. Brava I.P. and Boor further promised that they had sold all "intellectual property used in or necessary to conduct the business of manufacturing and selling plastic roofing shingles . . . as currently planned to be conducted." Boor conceded he started developing the Natura products in the 2000s and made inroads on research and development between 2011 and 2014. He confirmed he had planned to use the profits from the sale of Brava Roof Tile to finish research and development on projects such as the Natura designs. We discern no error in the district court's finding that Wildhawk had a fair chance of proving the Paragon Defendants violated the terms of the license agreement.

### B. Equitable Estoppel

All that said, Wildhawk's conduct after executing the license agreement leads us to conclude that success on the merits of the breach of contract claim is unlikely. Under Iowa's equitable estoppel doctrine, "the parties to a valid contract may estop themselves from asserting any right under the contract by conduct inconsistent with the continued existence of the original contract." Margeson v. Artis, 776 N.W.2d 652, 659 (Iowa 2009) (internal quotation marks omitted). An equitable estoppel defense requires clear and convincing evidence that: (1) the opposing party made a false representation or concealed material facts; (2) the party asserting estoppel lacked knowledge of the true facts; (3) the opposing party intended the party asserting estoppel to act upon the representation or concealment; and (4) the party asserting estoppel relied on the representation or concealment and thereby suffered prejudice. Sioux Pharm, Inc. v. Summit Nutritionals Int'l, Inc., 859 N.W.2d 182, 191 (Iowa 2015). "To establish false representation or concealment, there must be evidence the party acted 'with the intent to mislead the injured party.'" Boehme v. Fareway Stores, Inc., 762 N.W.2d 142, 147 (Iowa 2009) (quoting Hook v. Lippolt, 755 N.W.2d 514, 525 (Iowa 2008)).

Wildhawk professed that the NDA "did not accurately state . . . Wildhawk's understanding of the right of first refusal arrangement." Boor's repeated proposals to sell the Natura designs plainly revealed he thought they came within the right of first refusal rather than the preexisting license. Meanwhile, Brantman testified that Wildhawk believed "we had already paid for this" from the moment Boor sent the initial offer in August 2016. Wildhawk representatives never shared that belief with Boor during the protracted negotiations. Standing alone, silence from a party to an arms-length transaction is insufficient to sustain an equitable estoppel defense. EMC Ins. Grp. v. Shepard, 960 N.W.2d 661, 674 (Iowa 2021). But Wildhawk did more than stand mute. It affirmatively signed the NDA, which ostensibly reserved only a right of first refusal in "all new R&D developments . . . related to the composite roofing industry." When fairly read, that language necessarily included the Natura products. Wildhawk then proceeded to offer Boor millions of dollars in royalties to purchase the Natura designs and negotiated for months as if the right of first refusal applied. A Wildhawk member went so far as to suggest the possibility of more deals for Boor's composite shingle designs in the future. Wildhawk misrepresented its position on its entitlement to the Natura products in a manner inconsistent with the license agreement.

As for intent to induce reliance, again in its own words, "Wildhawk executed the NDA in an effort to continue its valuable relationship with Boor." Boor asked Wildhawk to sign the NDA as an assurance before deciding to renew his consulting agreement. Brantman testified that because Boor was "very valuable" to Wildhawk, "we weren't ready to really pick a fight with him." He went on to describe "the idea that [Boor] wouldn't be working with us as a sales consultant" as "concerning." That concern led Wildhawk to sign the NDA and to go along with Boor's offers to sell the Natura designs without ever claiming an existing right to them under the license agreement. Cf. Hawkeye Land Co. v. Iowa Power & Light Co., 497 N.W.2d 480, 487 (Iowa Ct. App. 1993) (deeming intent element met where opposing party "never informed" party asserting estoppel "it was receiving anything less than a full and complete permanent easement" as envisioned by oral contract). Wildhawk intended

-11-

to entice Boor to stay on as a consultant by misrepresenting its understanding of the right of first refusal arrangement.

The remaining equitable estoppel elements are satisfied as well. Boor lacked knowledge of Wildhawk's true understanding. The preliminary negotiations for the license agreement, offers to sell the Natura designs, and hearing testimony uniformly evince that Boor believed Wildhawk had nothing more than a right of first refusal in all new product developments, even those related to the composite roofing industry. See Bricker v. Maytag Co., 450 N.W.2d 839, 840-41 (Iowa 1990) (upholding estoppel defense notwithstanding relevant contract language due to opposing party's representations). Boor testified he would not have formed Paragon or incurred over $1 million in expenses to commence production if he had known about Wildhawk's legitimate claim to the Natura products. Equity bars Wildhawk from now declaring ownership after the Paragon Defendants detrimentally relied on its representations.

Uncontroverted evidence establishes each element of equitable estoppel. The district court abused its discretion in rejecting the defense and in finding Wildhawk had a likelihood of success on its breach of contract claim.

## C.     Irreparable Harm

We have doubts about whether Wildhawk faced a threat of irreparable harm. To demonstrate irreparable harm, the movant "must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." Roudachevski v. All-Am. Care Ctrs., Inc., 648 F.3d 701, 706 (8th Cir. 2011) (citation omitted). The absence of irreparable harm "is an independently sufficient ground upon which to deny a preliminary injunction." Grasso Enters., LLC v. Express Scripts, Inc., 809 F.3d 1033, 1040 (8th Cir. 2016) (quoting Watkins Inc. v. Lewis, 346 F.3d 841, 844 (8th Cir. 2003)).

The district court determined that Wildhawk would suffer irreparable harm by losing customers and market share to Paragon. "Economic loss, on its own, is not an irreparable injury so long as the losses can be recovered." DISH Network Serv. L.L.C. v. Laducer, 725 F.3d 877, 882 (8th Cir. 2013). Wildhawk submitted an itemized list of all Paragon's sales from inception and specifically identified which sales came from its past customers. Such harm is compensable by money damages. See MPAY Inc. v. Erie Custom Comput. Applications, Inc., 970 F.3d 1010, 1020 (8th Cir. 2020) ("[I]t appears that any harm [plaintiff] may suffer in the form of lost customers and lost profits is quantifiable and compensable with money damages . . . meaning this harm is not irreparable."); Mgmt. Registry, Inc. v. A.W. Cos., 920 F.3d 1181, 1183-84 (8th Cir. 2019) (concluding that plaintiff lacked threat of irreparable harm where only injury was calculable loss of revenue).

Wildhawk's alternative assertion that the Paragon Defendants will irreparably injure its "business reputation and goodwill," Med. Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc., 336 F.3d 801, 805 (8th Cir. 2003), is undermined by its decision to wait more than a year to bring this lawsuit despite knowing Boor and Edson intended to produce the Natura products themselves. See Benisek v. Lamone, 585 U.S. ___, 138 S. Ct. 1942, 1944 (2018) (per curiam) (explaining that "a party requesting a preliminary injunction must generally show reasonable diligence"); Adventist Health Sys./Sunbelt, Inc. v. U.S. Dep't of Health & Hum. Servs., 17 F.4th 793, 806 (8th Cir. 2021) (finding lack of irreparable harm where plaintiff delayed suit until one year after adoption of challenged policy). When Boor gave Wildhawk a final opportunity to purchase the Natura products in August 2019, he implied that he and Edson planned to "produc[e] the materials ourselves while still owning the company" if Wildhawk declined the offer. Boor emphasized that "[t]ime [was] of the essence." Rather than tell Boor about its putative ownership rights or expeditiously file suit, however, Wildhawk did not meaningfully respond to the offer and waited until November 2020 to commence this action.

The Paragon Defendants were prejudiced by Wildhawk's delay. See Kroupa v. Nielsen, 731 F.3d 813, 821 (8th Cir. 2013) (evaluating prejudice where defendant claimed delay in seeking preliminary injunction counseled against irreparable harm). Boor incurred over $1 million in expenses to start manufacturing the Natura products through Paragon, which he had formed eight months earlier. Wildhawk waited until Paragon had been producing the Natura products for ten months before making its ownership claim. Wildhawk failed to show either reasonable diligence or harm that cannot be compensated by money damages.

## III.   CONCLUSION

Our duty when reviewing whether injunctive relief is warranted is limited to determining "whether the district court abused its discretion in assessing 'whether the balance of equities so favors [Wildhawk] that justice requires the court to intervene to preserve the status quo until the merits are determined.'" Sessler v. City of Davenport, 990 F.3d 1150, 1156-57 (8th Cir. 2021) (quoting Powell v. Noble, 798 F.3d 690, 702-03 (8th Cir. 2015)). On this record, we find an abuse of discretion. Wildhawk is not likely to prevail on the merits of its breach of contract claim and has not proven a threat of irreparable harm. Because the district court concluded otherwise in weighing the Dataphase factors, we reverse and vacate the preliminary injunction and remand for further proceedings consistent with this opinion.

_____