# United States Court of Appeals
## For the Eighth Circuit

_____

No. 21-2823
_____

Gurpreet S. Padda, M.D.; Interventional Center for Pain Management, P.C.

*Plaintiffs - Appellants*

v.

Xavier Becerra, in his official capacity as Secretary of the United States Department of Health and Human Services; Chiquita Brooks-LaSure,[1] in her official capacity as Administrator for the Centers for Medicare and Medicaid Services; Wisconsin Physician Insurance Corporation, doing business as WPS Government Health Administrators

*Defendants - Appellees*
_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis
_____

Submitted: April 12, 2022
Filed: June 17, 2022
_____

Before COLLOTON, MELLOY, and GRUENDER, Circuit Judges.
_____

MELLOY, Circuit Judge.

---

[1]Chiquita Brooks-LaSure has been appointed to serve as Administrator for the Centers for Medicare and Medicaid Services and is substituted as an appellee pursuant to Federal Rule of Appellate Procedure 43(c).

The government alleges that Medicare overpaid Dr. Gurpreet Padda and his medical practice, Interventional Center for Pain Management (collectively, "Dr. Padda"), approximately $5.31 million. Reviewing contractors substantially affirmed the overpayment decision at two levels of administrative review. While the third level of administrative review, a hearing before an Administrative Law Judge ("ALJ"), was pending, Medicare began to recover the overpaid funds by withholding new reimbursements from Dr. Padda.

Dr. Padda sued, arguing that recovery prior to an ALJ hearing and decision violates procedural due process. He moved for a preliminary injunction to prevent Medicare from recovering payments prior to the ALJ decision. The district court[2] denied the preliminary injunction and Dr. Padda appealed.

Dr. Padda has not shown that he satisfies the requirements for a preliminary injunction. He has not shown that he is likely to prevail on the merits of his procedural due process claim nor that he is likely to suffer irreparable harm. Therefore, we affirm the denial of the preliminary injunction.

I.

This case involves the administrative review process for Medicare appeals and how a backlog in that process has affected review of Dr. Padda's alleged overpayments.

A.

Medicare provides a health insurance program for the elderly and disabled. See 42 U.S.C. § 1395 et. seq. Medicare regularly pays medical providers for the services they perform for Medicare beneficiaries. Id. § 1395g. When Medicare pays

---

[2]The Honorable Sarah E. Pitlyk, United States District Judge for the Eastern District of Missouri.

providers, it usually does not review the claim. Instead, Medicare "generally pays facially valid claims, and conducts post-payment audits to detect overpayments." Sahara Health Care, Inc. v. Azar, 975 F.3d 523, 525 (5th Cir. 2020); see 42 U.S.C. § 1395ddd.

Medicare contractors perform these audits. See 42 U.S.C. § 1395ddd. When a contractor conducts an audit, it must give written notice of the audit to the provider. Id. § 1395ddd(f)(7). The contractor collects a sample of past payments and reviews them for accuracy. See id. §§ 1395ddd(f)(4), (8). If the contractor finds overpayments in the sample and finds "a sustained or high level of payment error," it may use statistical extrapolation to calculate the total amount that the provider was overpaid. Id. § 1395ddd(f)(3). The contractor must give the provider a full explanation of the audit's findings. Id. § 1395ddd(f)(7).

If an audit shows that a provider has been overpaid, Medicare may seek to recover the overpaid funds. One way Medicare recovers overpaid funds is through recoupment. Recoupment is "[t]he recovery by Medicare of any outstanding Medicare debt by reducing present or future Medicare payments and applying the amount withheld to the indebtedness." 42 C.F.R. § 405.370(a). Thus, under recoupment, a provider does not directly repay Medicare. Instead, the money the provider owes is withheld from future payments. If the overpayment is so high that immediate repayment in full would constitute a "hardship" for the provider, Medicare may permit the provider to enter into a repayment plan. 42 U.S.C. § 1395ddd(f)(1)(A). Under a repayment plan, Medicare only recoups a portion of the amount owed from each of the provider's future payments. A repayment plan extends repayment for at least six months, but no more than three years, or, in cases of extreme hardship, no more than five years. Id. "Hardship" means that the recouped payments would be greater than 10% of the amount Medicare paid to the provider in either the last year, or the last reporting period, depending on the nature of the provider. Id. § 1395ddd(f)(1)(B)(i).

-3-

If a Medicare contractor determines a provider has been overpaid, the provider may challenge that decision through administrative and judicial review. See id. § 1395ff. The administrative review process has four steps: (1) redetermination by the contractor; (2) reconsideration by a Qualified Independent Contractor; (3) a hearing before an Administrative Law Judge; and (4) review by the Appeals Council. Id. At the first and second steps, the provider may submit evidence and must provide a written explanation for its disagreement with the original decision. Sahara Health Care, 975 F.3d at 526; 42 C.F.R. §§ 405.946(a), 405.966(a). Both steps 1 and 2 are to result in a written, reasoned decision. 42 U.S.C. §§ 1395ff(a)(5), (c)(3)(E).

At step 3, the provider is entitled to a hearing before an ALJ. Id. § 1395ff(d)(1)(A). At this hearing, the parties may submit new evidence only if "there is good cause which precluded the introduction of such evidence at" the first or second steps. Id. § 1395ff(b)(3). This means that generally a provider cannot introduce new evidence for the first time at an ALJ hearing. The provider may examine the evidence in the record and may question and cross examine witnesses. 42 C.F.R. § 405.1000(b). The ALJ must issue a decision within 90 days of the request for hearing. 42 U.S.C. § 1395ff(d)(1)(A). If the ALJ's decision is adverse to the provider, the provider may appeal to the Appeals Council. Id. § 1395ff(d)(2)(A); 42 C.F.R. § 405.1100(a). If the ALJ does not issue a decision within the statutory period, the provider may escalate the case—that is, the provider may choose to skip review by the ALJ and proceed directly to review by the Appeals Council. 42 U.S.C. § 1395ff(d)(3)(A).

The Appeals Council has 90 days (or 180 days, if the case was escalated), to review the case and issue a decision. 42 C.F.R. §§ 405.1100(c), (d). If the Appeals Council issues an adverse ruling, or if the statutory period expires without any decision, the provider may seek judicial review. 42 U.S.C. §§ 1395ff(b)(1)(A), 1395ff(d)(3)(B), 405(g). Medicare may not recoup payments during the first two steps of the administrative process—redetermination and

-4-

reconsideration. Id. § 1395ddd(f)(2)(A).  Medicare may, however, recoup payments while the provider appeals to an ALJ, the Appeals Council, or to federal court.  42 C.F.R. §§ 405.379(d)(4)–(5).

In recent years, Medicare has been overwhelmed by appeals.  Sahara Health Care, 975 F.3d at 527.  "Between 2009 and 2014, the number of ALJ appeals increased more than 1,200 percent" without a corresponding increase in budget to resolve those appeals.  Id.  This resulted in a years-long backlog of pending appeals. Id.  Although Congress and the Centers for Medicare and Medicaid Services have taken steps to alleviate the backlog, the overwhelming number of appeals resulted in a significant period during which Medicare was not able to provide ALJ hearings within the statutory period.  Id.  Medicare reports that it is on track to eliminate the backlog by the end of fiscal year 2022.

B.

Based on a post-payment audit, the government alleges that it overpaid Dr. Padda for services he provided to Medicare patients.  The Medicare auditor used extrapolation to calculate a total overpayment of approximately $5.96 million.  Dr. Padda, through counsel, challenged that decision through the first two levels of administrative review—redetermination and reconsideration.  At both levels, Dr. Padda exercised his right to submit evidence and written argument.  He argued the services were medically necessary and the Medicare contractor's statisticians made errors in performing the extrapolation.

At the reconsideration stage, Dr. Padda's case was reviewed by a panel of experts, including a physician and a statistician.  After this review, the Qualified Independent Contractor issued a partially favorable decision to Dr. Padda.  His overpayment was adjusted down to approximately $5.31 million, plus interest. After the reconsideration decision, Medicare was entitled by statute to begin recouping the overpayment. There is no evidence Dr. Padda requested an extended repayment plan.

See Padda Br. at 19; Reply Br. at 6. If he had requested one, it appears Dr. Padda would have been eligible for a repayment plan. Dr. Padda stated that he received approximately $99,000 per month from Medicare, or approximately $1.188 million per year. The alleged overpayment—$5.31 million—was more than 10% of his annual Medicare payments. See 42 U.S.C. § 1395ddd(f)(1)(B)(i).

Dr. Padda requested an ALJ hearing on March 30, 2021. That hearing was not held within the 90-day time frame permitted by statute. When the time limit expired, Dr. Padda did not invoke his right to escalate his case to the Appeals Council. Instead, within one month of requesting the hearing, Dr. Padda sued in federal court. He alleged that recoupment prior to an ALJ hearing is a violation of procedural due process. Dr. Padda moved for a preliminary injunction from the district court to prevent Medicare from recouping until after he received an ALJ hearing. The district court denied the injunction, finding Dr. Padda was not likely to succeed on the merits of his procedural due process claim and had not demonstrated he was likely to suffer irreparable harm. Dr. Padda appealed.

Dr. Padda's ALJ hearing was held on April 4, 2022, while this appeal was pending.[3]

II.

We review the denial of a preliminary injunction for abuse of discretion. Turtle Island Foods, SPC v. Thompson, 992 F.3d 694, 698 (8th Cir. 2021). A district court abuses its discretion when it "rests its conclusion on clearly erroneous factual finding[s] or erroneous legal conclusions." Id. at 698–99 (quoting Minn. Citizens Concerned for Life, Inc. v. Swanson, 692 F.3d 864, 870 (8th Cir. 2012) (en banc)).

---

[3]As of June 14, 2022, no decision had been issued by the ALJ. See ALJ Appeal Status Information System Inquiry Page, Off. of Medicare Hearings & Appeals, https://aasis.omha.hhs.gov (search for: Medicare Appeal No. 1-9768094016) (last visited June 14, 2022).

We review legal conclusions de novo. Id. at 699. A plaintiff seeking a preliminary injunction "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008); see also Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981) (en banc).

A.

The first factor in the preliminary injunction analysis is whether the plaintiff is likely to succeed on the merits. Here, the question is whether Dr. Padda is likely to succeed on his procedural due process claim.

To state a claim for a violation of procedural due process, a plaintiff "must show a deprivation of life, liberty, or property without sufficient process." Hughes v. City of Cedar Rapids, 840 F.3d 987, 994 (8th Cir. 2016). Medicare does not challenge the assertion that Dr. Padda has a property interest in Medicare payments he has earned, so we will proceed to the issue of whether Dr. Padda received sufficient process. See Mickelson v. Cnty. of Ramsey, 823 F.3d 918, 924–25 (8th Cir. 2016).

Procedural due process entitles an individual to "notice and an opportunity to respond." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 546 (1985). "The requirements of due process are not rigid; rather, they 'call for such procedural protections as the particular situation demands.'" Mickelson, 823 F.3d at 924 (quoting Greenholtz v. Inmates of Neb. Penal & Corr. Complex, 442 U.S. 1, 12 (1979)) (alteration omitted). To determine if process is sufficient, courts balance three factors: "first, the private interest that will be affected by the official action; second, the Government's interest; and third, the risk of an erroneous deprivation of the private interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards." Id. (quoting Wallin v. Minn. Dep't

of Corr., 153 F.3d 681, 690 (8th Cir. 1998)) (internal quotations and alterations omitted); see Matthews v. Eldridge, 424 U.S. 319, 335 (1976) (establishing elements).

We first conclude that Dr. Padda's interest in avoiding erroneous recoupment outweighs the government's interest in prompt repayment. Dr. Padda declared that Medicare payments account for approximately 33% of his practice's total monthly revenue. He stated that he received approximately $99,000 per month in Medicare payments. Loss of this income, he stated, would force him to significantly reduce his workforce and the number of patients he treats, and may cause him to close his business. Although he would be repaid any wrongly recouped funds with interest, the money "will be cold comfort if [Dr. Padda's practice] has already closed its doors." Sahara Health Care, 975 F.3d at 530. Dr. Padda has a significant interest in avoiding erroneous recoupment. The government's interest in prompt recoupment, however, is relatively slight. Medicare has an interest in protecting public resources and preventing fraud. But these interests are not as urgent as Dr. Padda's interest in his income. There is no evidence in the record that any delay in recovery against Dr. Padda will cause long-term harm to Medicare or prevent Medicare from providing services to other beneficiaries. Any amount that Dr. Padda owes to Medicare will continue to accrue interest until it is paid. 42 U.S.C. § 1395ddd(f)(2)(B). Dr. Padda's interest weighs more heavily than the government's.

Because Dr. Padda has a significant property interest, we "must consider 'the likelihood of an erroneous deprivation of the private interest involved as a consequence of the procedures used.'" Mickelson, 823 F.3d at 926 (quoting Mackey v. Montrym, 443 U.S. 1, 13 (1979)). Thus, we consider whether the administrative procedures Dr. Padda has already received, or those he chose to forgo, adequately protect his property interest. We conclude that they do.

The first two stages of administrative review provided Dr. Padda with notice and an opportunity to be heard. Loudermill, 470 U.S. at 546. At each stage, Dr.

Padda was represented by counsel and submitted written arguments and evidence. Both levels of review resulted in written, reasoned decisions. By the second level, Dr. Padda presented an expert report on the issue of statistical extrapolation. His case was reviewed by a panel of experts, including a physician and a statistician. The second-level reconsideration decision was a 37-page decision that addressed each of Dr. Padda's arguments in turn, including the statistical arguments made by his expert. These procedures were a meaningful opportunity for Dr. Padda to be heard before the government began recoupment.

In determining whether Dr. Padda received sufficient process, we also consider the procedures he chose not to pursue. When Dr. Padda did not receive an ALJ decision within the statutory period, he had the right to escalate the case to the Appeals Council and, ultimately, to seek judicial review. 42 U.S.C. § 1395ff(d)(3). Dr. Padda "cannot complain about lacking due process when the privation (forgoing escalation and judicial review) was [his] own choice." Sahara Health Care, 975 F.3d at 533. It is particularly significant that Dr. Padda chose to forgo judicial review because "the 'right to a judicial hearing is the classic protection provided by the Due Process Clause against arbitrary deprivations of life, liberty, or property.'" Mo. Roundtable for Life v. Carnahan, 676 F.3d 665, 677 (8th Cir. 2012) (quoting Larson v. City of Fergus Falls, 229 F.3d 692, 697 (8th Cir. 2000)).

Given the procedures Dr. Padda has already received, he has not demonstrated that an ALJ hearing and decision will afford him such significant additional protections that they are constitutionally required prior to recoupment. Dr. Padda particularly focuses on the ability to present additional evidence and availability of cross-examination. See Padda Br. at 13; Reply Br. at 3 ("Plaintiffs must be able to cross-examine Defendants' witnesses on this issue. . . . Under the unique circumstances of this case, cross-examination related to the sampling and extrapolation process is vital."). Dr. Padda received an ALJ hearing on April 4, 2022. He has not identified any evidence that he sought to admit for the first time at the ALJ

hearing. Furthermore, Dr. Padda's counsel conceded at oral argument that he was not able to cross-examine any government witnesses because Medicare did not participate in the hearing. Because the protections he sought were not available at the ALJ hearing, Dr. Padda has not demonstrated that the hearing added sufficient protections as to be constitutionally required.

We recognize that the presentation of live testimony and oral argument may help the ALJ ensure an accurate resolution of the case. But when the provider has already had two opportunities to present evidence and written arguments, these benefits are not so significant that they are required by due process prior to recoupment. Given the procedural safeguards present at the first two levels of review, due process does not require live testimony before the government may begin recoupment.

We agree with the two other Courts of Appeals that have concluded Medicare's recoupment of overpayments prior to an ALJ decision does not violate procedural due process. See Sahara Health Care, 975 F.3d at 530; Accident, Inj. & Rehab., PC v. Azar, 943 F.3d 195, 204–05 (4th Cir. 2019). In considering the risk of an erroneous deprivation of property and the value of additional procedures, the additional procedures of an ALJ hearing do not so substantially reduce the risk of an erroneous deprivation as to be constitutionally required prior to recoupment. Sahara Health Care, 975 F.3d at 532. And when we view the process of administrative review as a whole, a provider's ability to escalate its claims ensures that the provider receives a timely disposition of its claims, even when there are delays at the ALJ stage. Accident, Inj. & Rehab, 943 F.3d at 204. By providing a timely alternative, the administrative review system does not violate procedural due process.

Dr. Padda has received a meaningful opportunity to be heard at the first two stages of administrative review. He has chosen to forgo additional procedures

available to him. It does not violate due process for the government to begin recoupment before Dr. Padda has received a decision from an ALJ.

Dr. Padda has failed to show that he is likely to succeed on the merits of his procedural due process claim. This factor weighs against granting him a preliminary injunction.

B.

A second factor courts consider in issuing a preliminary injunction is the likelihood of irreparable harm. A party seeking a preliminary injunction "must show he is 'likely to suffer irreparable harm in the absence of preliminary relief.'" Sessler v. City of Davenport, 990 F.3d 1150, 1156 (8th Cir. 2021) (quoting Winter, 555 U.S. at 20). To meet this requirement, "the movant must show more than the mere possibility that irreparable harm will occur." Id. Furthermore, the harm shown must be more than mere speculation. MPAY Inc. v. Erie Custom Comput. Applications, Inc. 970 F.3d 1010, 1020 (8th Cir. 2020). "[F]ailure of a movant to show irreparable harm is an 'independently sufficient basis upon which to deny a preliminary injunction.'" Sessler, 990 F.3d at 1156 (quoting Watkins Inc. v. Lewis, 346 F.3d 841, 844 (8th Cir. 2003)). Generally, "[e]conomic loss, on its own, is not an irreparable injury so long as the losses can be recovered." Wildhawk Invs., LLC v. Brava I.P., LLC, 27 F.4th 587, 597 (8th Cir. 2022).

Dr. Padda's alleged harms are insufficient to support a preliminary injunction. Dr. Padda declared that he received approximately $99,000 per month in Medicare payments. This accounted for approximately 33% of his practice's monthly gross revenue. He stated that offsets "would cause . . . a significant reduction in workforce and capacity to see patients, reduction in practice operations, reduction in patients treated, as well as the potential for practice closure."

-11-

Dr. Padda's statements are vague and speculative. As to vagueness, Dr. Padda does not explain what constitutes "a significant reduction" in his workforce or his capacity to see patients. He does not explain how many employees will be fired, or even how many employees he currently has. Although Dr. Padda's first declaration states that "approximately 19,000 patients would be impacted," he does not identify how many total patients he has, or what it means for them to be "impacted." He does not explain if they will be "impacted" because they will have to wait longer at their appointments, or if they will be "impacted" because they will totally lose access to life-saving treatments. Without these details, Dr. Padda has not specifically identified what harm he will suffer or how that harm is more than reparable, economic damage.

Regarding the speculative nature of his statements, Dr. Padda has not submitted supporting evidence with his conclusory declaration to explain how recoupment will force him to reduce his staff and patients. He did not present any documentation demonstrating the business's monthly revenues, expenses, or profits. In his first declaration, he asserted that the practice had already lost "a significant portion of its Medicare patients as a direct result of actions taken by Medicare related to this billing dispute." But he did not present any evidence as to what "a significant portion" means or how that loss affected the practice. Furthermore, although Dr. Padda asserts that recoupment may cause "the potential for practice closure," he does not elaborate on that claim. He does not identify what factors would cause that "potential" to become a reality. The only evidence available indicates that recoupment would not cause practice closure. Medicare began recoupment in May 2021. Dr. Padda's counsel conceded at oral arguments that the practice is still open.

Finally, Dr. Padda's claims of irreparable harm are undercut by his apparent failure to try to ease the burdens of recoupment. Dr. Padda states that he earns approximately $99,000 from Medicare per month. That would result in approximately $1.188 million annually from Medicare. His alleged overpayment, $5.31 million plus interest, is well over 10% of his annual Medicare payments. Thus,

it appears Dr. Padda would be eligible for a repayment plan. He has not shown, however, that he ever sought such a plan. A repayment plan would reduce the amount of money that Dr. Padda was required to repay before he received an ALJ decision. It would also reduce the harm that Dr. Padda suffers by allowing him to distribute the losses over a greater period of time. Dr. Padda's failure to seek a repayment plan indicates that there are alternative methods available to him to reduce his harm without resorting to a preliminary injunction.

Dr. Padda has failed to show that he will be irreparably harmed without a preliminary injunction. The second factor weighs against granting the injunction.

C.

Dr. Padda's counsel requested that we remand this case for the district court to consider the final two factors in the preliminary injunction analysis. Because we have found that Dr. Padda failed to establish the first two factors, a remand is not necessary. Dr. Padda has not shown that he is entitled to a preliminary injunction.

III.

Dr. Padda has not shown that he is likely to prevail on the merits of his procedural due process claim. He also has not shown that he will be irreparably harmed without a preliminary injunction. Because he has not met these factors, we affirm the district court's denial of the preliminary injunction.

_____