# United States Court of Appeals
### For the Eighth Circuit

_____

No. 23-3230

_____

Firearms Regulatory Accountability Coalition, Inc.; State of West Virginia;
State of North Dakota; State of Alabama; State of Alaska; State of Arkansas;
State of Florida; State of Georgia; State of Idaho; State of Indiana; State of Iowa;
State of Kansas; State of Kentucky; State of Louisiana; State of Mississippi;
State of Missouri; State of Montana; State of Nebraska; State of New Hampshire;
State of Oklahoma; State of South Carolina; State of South Dakota;
State of Tennessee; State of Utah; State of Virginia; State of Wyoming;
NST Global, LLC, doing business as SB Tactical; B&T USA, LLC;
Richard Cicero

*Plaintiffs - Appellants*

v.

Merrick B. Garland, in his Official Capacity, as Attorney General of the United
States; The Bureau of Alcohol, Tobacco, Firearms and Explosives;
Steven Dettelbach, in his Official Capacity, as Director of the Bureau of Alcohol,
Tobacco, Firearms and Explosives

*Defendants - Appellees*

------------------------------

Members of Congress

*Amicus on Behalf of Appellants*
_____

Appeal from United States District Court
for the District of North Dakota
_____

Submitted: March 14, 2024
Filed: August 9, 2024
_____

Before GRUENDER, SHEPHERD, and GRASZ, Circuit Judges.
_____

GRASZ, Circuit Judge.

The Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) promulgated a final agency rule[1] interpreting the National Firearms Act of 1934 (NFA) and the Gun Control Act of 1968 (GCA). The Final Rule reclassifies pistols equipped with stabilizing braces (braced weapons) as NFA-regulated "short-barreled rifles," which subjects those braced weapons to NFA/GCA regulation. The plaintiffs—a stabilizing-brace manufacturer, a firearm manufacturer, a gun association, an individual owner of braced weapons, and twenty-five states (collectively, the Coalition)—sued to enjoin the Final Rule, arguing it exceeds the ATF's statutory authority under the NFA and GCA and is arbitrary and capricious. The district court denied the Coalition's motion for a preliminary injunction. The Coalition appeals that denial. We conclude the Coalition is likely to succeed on the merits of its arbitrary-and-capricious challenge, so we reverse and remand to the district court.

## I. Background

### A. The National Firearms Act and the Gun Control Act

Congress passed the National Firearms Act of 1934, 26 U.S.C. §§ 5801–5872, in response to rampant criminal gang violence. *See Mock v. Garland*, 75 F.4th 563, 570 & n.12 (5th Cir. 2023). The NFA's purpose is to "regulate certain weapons

---

[1]Factoring Criteria for Firearms with Attached "Stabilizing Braces" (the Final Rule), 88 Fed. Reg. 6,478 (Jan. 31, 2023) (codified in 27 C.F.R. pts. 478 & 479).

likely to be used for criminal purposes," such as easily-concealed weapons. *United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 517 (1992) (plurality opinion). Congress authorized the Attorney General to enforce both the NFA and GCA. *See* 26 U.S.C. §§ 7801(a)(2), 7805; 18 U.S.C. § 926. In turn, the Attorney General delegated that regulatory authority to the ATF. *See* 28 C.F.R. § 0.130; Final Rule at 6,481.

The NFA's regulations apply only to "firearms." *See* 26 U.S.C. § 5861. Accordingly, "'[f]irearms' is a term of art—one that is both highly under- and over-inclusive (as compared to the word's ordinary meaning today)." *Mock*, 75 F.4th at 567. For example, "pistols" and "revolvers"—which the ordinary person would understand to be firearms—are not NFA "firearms."[2] 26 U.S.C. § 5845(a)(5), (e) (the term "any other weapon" does not include "a pistol or a revolver . . . ."). NFA firearms include "short-barreled rifles," which are any "rifle having a barrel or barrels of less than 16 inches in length," *id.* § 5845(a)(3), or "a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length," *id.* § 5845(a)(4). A "rifle" is defined as "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder . . . ." *Id.* § 5845(c). Meanwhile, the terms "made or remade" are defined as "manufacturing (other than by one qualified to engage in such business under this chapter), putting together, altering, any combination of these, or otherwise producing a firearm." *Id.* § 5845(i). "Congress placed stricter requirements on the making and possession of short-barreled rifles, deeming them to be dangerous and unusual weapons and posing a significant danger to the public," Final Rule at 6,481, as their concealable nature makes criminals more likely to use them, *see Thompson*, 504 U.S. at 517 (plurality opinion). Short-barreled rifles, as with other NFA/GCA firearms, are not per se illegal or banned weapons, but the making, selling, owning, and transferring of short-barreled rifles is highly regulated. A few example regulations include:

---

[2]The ATF defines "pistols" and "revolvers" in its regulations. *See* 27 C.F.R. §§ 478.11, 479.11.

- any person possessing a short-barreled rifle must register his or her possession in the National Firearms Registration and Transfer Record, 26 U.S.C. § 5841;
- any person who wants to transfer or make a short-barreled rifle must first obtain the U.S. Attorney General's approval, *see* 26 U.S.C. §§ 5812, 5822, and pay a $200 tax, *see* 26 U.S.C. §§ 5811, 5821; and
- "any person engaged in the business of importing, manufacturing, or dealing NFA firearms must register with the Attorney General and pay a special (occupational) tax," Final Rule at 6,479 (citing 26 U.S.C. §§ 5801–02).

Failing to comply with the requirements of the NFA and GCA begets serious consequences, including fines,[3] forfeiture of the firearm,[4] and felony conviction and imprisonment[5] followed by a lifetime ban on firearm ownership.[6] *See Mock*, 75 F.4th at 570–71. In other words, "those statutory restrictions have *teeth*," and those teeth will bite anyone who, either intentionally or negligently, fails to comply with these regulations. *See id.* at 570 (emphasis added). "Consequently, there are immense incentives not to own [a short-barreled rifle] but instead to have a non-NFA-regulated pistol." *Id.* at 571.

## B. Weapons with Attached Stabilizing Braces

In 2012, plaintiff SB Tactical developed its pistol stabilizing brace "to assist people with disabilities so that they could fire . . . heavy pistols safely and comfortably" with one hand. *See* Final Rule at 6,479. SB Tactical describes its stabilizing braces as "orthotic devices that attach to the rear of a firearm," consisting

---

[3]*E.g.*, 18 U.S.C. §§ 924(a)(1), 3571(b)–(c); 27 C.F.R. § 479.191

[4]*E.g.*, 26 U.S.C. § 5872.

[5]*E.g.*, 18 U.S.C. § 924(a)(1); 26 U.S.C. § 5871.

[6]*See* 18 U.S.C. § 922(g)(1).

-4-

of "a strap and a cuff made of elastomer material," which "allow[s] the shooter to secure the pistol against their forearm."[7]

SB Tactical asked the ATF whether its stabilizing brace—when attached to the rear of a pistol—would change a pistol's classification under the NFA or GCA. *See* Final Rule at 6,479. The ATF initially answered no, determining the stabilizing brace "was not designed or intended to fire a weapon from the shoulder" but rather to allow a weapon to be "held and operated with one hand." *Id.* (internal quotation marks omitted). Thus, the ATF initially concluded the braced pistol was not subject to the NFA's controls. *Id.* Plaintiff Richard Cicero was one of the stabilizing brace's earliest users. A combat veteran who lost both his right arm and leg while serving his country in Afghanistan, Cicero discovered the stabilizing brace helped him and other physically-challenged shooters to use heavy pistols, which they would otherwise not be able to shoot properly. Cicero uses his weapon's stabilizing brace as SB Tactical claims it intends the brace to be used; with the strap wrapped around the forearm and the cuff providing stabilizing support for the forearm:



Thus, as the ATF concluded at the time, a pistol with an attached stabilizing brace was not intended to be fired from the shoulder, which means the weapon was neither a "rifle" nor a "short-barreled rifle" for purposes of the NFA and GCA.

---

[7]*See* Forearm-gripping Stabilizing Attachment for a Handgun, U.S. Patent No. 8,869,444-B2 (filed Feb. 25, 2012) (issued Oct. 28, 2014).

Though SB Tactical's stabilizing brace may have been the first of its kind, it was not the last. Since the ATF made its initial determination, "the variety of available 'stabilizing braces' or similar 'brace' devices . . . has grown significantly." *Id.* In 2014, the ATF began to see stabilizing braces being used to shoulder weapons, while new stabilizing braces "included characteristics common to shoulder stocks." *Id.* This "diversity" of stabilizing braces "yielded a plethora" of braced weapons whose "objective design features" suggested to the ATF the attached brace was intended to make the pistol a shoulder-fired weapon, and thus a "firearm." *Id.* The photo below shows two different weapon platforms, each with a different type of rearward attachment. The top-pictured weapons are heavy pistols attached with stabilizing braces. The bottom-pictured weapons are the same heavy pistols but fitted with traditional shoulder stocks, which indisputably makes them "short-barrel rifles."



To be sure, there are visual similarities between the weapons attached with stabilizing braces and the weapons fitted with traditional shoulder stocks. *See Mock*, 75 F.4th at 589 n.1 (Higginson, J., dissenting). And as the ATF noted, some trade magazines' marketing materials began including photos of individuals shouldering braced weapons, even though the pictured weapon is marketed as a pistol. *See, e.g.*, Final Rule at 6,527 (photo below).



By late 2020, due to the increase in braced weapons, the ATF concluded (1) it needed to clarify how it would evaluate weapons equipped with stabilizing braces; (2) some manufacturers were labeling their stabilizing braces as "ATF compliant," even though the ATF had not evaluated those stabilizing braces for compliance; and (3) stabilizing braces were being used with weapons "to create short-barreled rifles without following NFA requirements." Final Rule at 6,494. To resolve these issues, the ATF set out to change how it interpreted the NFA's and GCA's definition of "rifle."

### C. The Proposed Rule and the Final Rule

On June 10, 2021, the Department of Justice published in the Federal Register its notice of proposed rulemaking, introducing its proposed rule. *See* Factoring Criteria for Firearms with Attached "Stabilizing Braces" (the Proposed Rule), 86 Fed. Reg. 30,826 (June 10, 2021). In it, the ATF introduced a new worksheet for public comment, "Worksheet 4999," which would "allow individuals or members of the firearms industry to evaluate whether a weapon incorporating a 'stabilizing brace' . . . will be considered a 'short-barreled rifle' or 'firearm' under the GCA and NFA." *Id.* at 30,828. To make that determination, Worksheet 4999 incorporated a point-based system, whereby it would assign "a weighted value to various characteristics of the fully assembled firearm" based on "objective design

characteristics or features that are common to rifles, features associated with shoulder stocks, and those features limiting the ability to use the 'stabilizing brace' as an actual brace . . . ." *Id.* at 30,829. If an evaluated weapon accumulated "4 points or more" under Worksheet 4999's criteria, then the ATF would determine the weapon was "designed and intended to be fired from the shoulder," *id.*, and classify it as an NFA firearm, *see Mock*, 75 F.4th at 573.

The Proposed Rule proved controversial, and comments were overwhelmingly negative. *See id.* at 574 (noting the Proposed Rule proved to be "complex and confusing"); Final Rule at 6,497 (noting negative reception). So, eighteen months later, the ATF published the Final Rule; abandoning Worksheet 4999 and its point system altogether, while adopting a two-step, multifactor framework for evaluating whether a braced weapon is objectively designed and intended for shouldering. *See* Final Rule at 6,480. At the first step, the ATF examines whether a weapon "equipped with [a stabilizing brace] provides surface area that allows the weapon to be fired from the shoulder . . . ." *Id.* If so, then the ATF examines six other "objective design features and factors" that indicate whether "the weapon is designed, made, and intended to be fired from the shoulder." *Id.* Those six other factors are:

> (1) Whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles;
>
> (2) Whether the weapon has a length of pull . . . that is consistent with similarly designed rifles;
>
> (3) Whether the weapon is equipped with sights or a scope with eye relief that require the weapon to be fired from the shoulder in order to be used as designed;
>
> (4) Whether the surface area that allows the weapon to be fired from the shoulder is created by a buffer tube, receiver extension, or any other accessory, component, or other rearward attachment that is necessary for the cycle of operations;

(5) The manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon; and

(6) Information demonstrating the likely use of the weapon in the general community.

*Id.*

"The ATF theorized that under this new definition of 'rifle,' approximately 99% of pistols with stabilizing braces would be classified as rifles[.]" *Mock*, 75 F.4th at 574 & n.23. The Final Rule did not adjudicate "stabilizing braces *systematically*, such as by stating that a particular manufacturer's specific brace" *always* transforms a weapon into a rifle when attached to that weapon. *See id.* at 586 n.56 (emphasis added). The ATF deemed it not "administratively feasible" to follow commenters' suggestions to provide an exhaustive list of stabilizing braces. Final Rule at 6,513. Instead, the ATF would make its determinations on a weapon-by-weapon basis. *See id.* at 6,513–14.

Alongside the Final Rule, the ATF published two electronic slideshows (the Slideshows) to inform the public about weapons it considers "short-barreled rifles." *See id.* at 6,481. The first Slideshow contained thirty-two photos of "[c]ommon weapon platforms with attached 'stabilizing brace' designs that are short-barreled rifles,"[8] and the second Slideshow contained thirty-five photos of "[c]ommercially available firearms equipped with a 'stabilizing brace' that are short-barreled rifles."[9]

---

[8]ATF, *Common Weapon Platforms with Attached "Stabilizing Brace" Designs That Are Short-Barreled Rifles*, available at https://perma.cc/GX8K-A4TW. Some example slides from this Slideshow are included in Appendix A, attached to this opinion.

[9]ATF, *Commercially Available Firearms Equipped with a "Stabilizing Brace" That Are Short-Barreled Rifles*, available at https://perma.cc/BK6C-BRGQ. Some example slides from this Slideshow are included in Appendix B, attached to this opinion.

The ATF claims the Slideshows are for "placing the public on notice that listed firearm-brace combinations are likely to be classified as short-barreled rifles under the [Final] Rule's considerations," but it did not explain how it determined that the pictured weapons are short-barreled rifles. Nor do the Slideshows contain a photo of a single braced weapon the ATF would not consider to be a short-barreled rifle.

Though the Final Rule does not ban stabilizing braces or braced weapons that are "short-barreled rifles," the consequences of possessing a braced weapon deemed to be a "short-barreled rifle" are dire: that firearm and the person who possesses it are subject to the NFA's and GCA's stringent regulations and serious criminal penalties for non-compliance. Considering the ATF estimated that by 2020 there were, at the low end, three million stabilizing braces in circulation (with seven million at the high end) plus an untold number of stabilizing braces sold between 2020 and the Final Rule's publication in January 2023, then the Final Rule does the job of reclassifying these millions of braced weapons—and those who possess them—as violating the NFA and GCA.

After the Final Rule's publication, the ATF gave possessors of braced weapons until May 31, 2023 (120 days) to choose one of five options: (1) remove the firearm's short barrel and attach a barrel 16-inches or longer, changing the firearm's NFA classification; (2) register the weapon with the ATF as an NFA firearm, paying the applicable tax; (3) permanently remove the weapon's stabilizing brace;[10] (4) surrender the weapon to the ATF; or (5) destroy the weapon. *Id.* at 6,570. Anyone possessing a braced weapon who did not exercise one of these five

---

[10]The ATF noted that "the removal of a 'stabilizing brace' from a firearm that was originally received as a 'short-barreled rifle' results in the production of a 'weapon made from a rifle,' as defined by the NFA," but in its enforcement discretion, the ATF would "allow persons to reconfigure the firearm to a pistol by May 31, 2023 and will not require the registration of these firearms as a 'weapon made from a rifle.'" Final Rule at 6,570.

options would be "in violation of the NFA," against whom the ATF "may take enforcement action." *Id.* at 6,498.

## D. The Lawsuit

Since the Final Rule's publication, several lawsuits have been filed seeking to enjoin its enforcement,[11] including this one. In this case, the Coalition raised three grounds for a preliminary injunction: the Final Rule exceeds the ATF's statutory authority under the NFA/GCA; various aspects of the Final Rule—including its multifactor test—are arbitrary and capricious under the Administrative Procedure Act (APA); and the Slideshows are agency adjudications without explanation and evince that the Final Rule is arbitrary and capricious. Ultimately, the district court concluded the Coalition did not demonstrate a substantial likelihood of success on the merits of its claims, so it denied injunctive relief without analyzing the other injunctive factors. The Coalition appeals.

## II. Analysis

We have jurisdiction over an appeal from a district court's order denying a preliminary injunction. *See* 28 U.S.C. § 1292(a)(1). "We review a district court's ultimate ruling on a preliminary injunction for abuse of discretion, though we review its underlying legal conclusions de novo." *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013). "A district court abuses its discretion in denying a preliminary injunction if it 'rests its conclusion on clearly erroneous factual findings

---

[11]As of this writing, that list included *Britto v. ATF*, No. 2:23-CV-19-Z (N.D. Tex.); *Colon v. ATF*, No. 8:23-CV-223 (M.D. Fla.); *Miller v. Garland*, No. 1:23-CV-195 (E.D. Va.), *appeal filed*, 23-1604 (4th Cir. 2023); *Mock v. Garland*, No. 4:23-CV-95-O (N.D. Tex.); *Nat'l Rifle Assoc. v. ATF*, No. 3:23-CV-1471-L (N.D. Tex.); *Second Am. Found. v. ATF*, No. 3:21-CV-116-B (N.D. Tex.); *Texas v. ATF*, No. 6:23-CV-13 (S.D. Tex.), *appeal filed*, 23-40685 (5th Cir. 2023); *Tex. Gun Rights, Inc. v. ATF*, No. 4:23-CV-578-O (N.D. Tex.), *appeal filed*, 23-11204 (5th Cir. 2023); and *Watterson v. ATF*, No. 4:23-CV-80 (E.D. Tex.).

or erroneous legal conclusions.'" *Id.* (quoting *Barrett v. Claycomb*, 705 F.3d 315, 320 (8th Cir. 2013)).

In our circuit, "[a] plaintiff seeking a preliminary injunction must establish four factors showing such relief is warranted: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest." *Morehouse Enters., LLC v. ATF*, 78 F.4th 1011, 1016 (8th Cir. 2023) (quoting *MPAY Inc. v. Erie Custom Comput. Applications, Inc.*, 970 F.3d 1010, 1015 (8th Cir. 2020)). "When deciding whether to grant a preliminary injunction, courts ask 'whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined.'" *Id.* (quoting *Nebraska v. Biden*, 52 F.4th 1044, 1046 (8th Cir. 2022)). "The movant bears the burden of demonstrating the preliminary injunction is warranted because a preliminary injunction is an 'extraordinary remedy never awarded as of right.'" *Id.* (quoting *Progressive Techs., Inc. v. Chaffin Holdings, Inc.*, 33 F.4th 481, 485 (8th Cir. 2022)).

Here, we only review the district court's holding that the Coalition was not likely to succeed on the merits, as the district court did not examine the other three injunctive factors. Of the four injunctive factors, "likelihood of success on the merits is most significant," *S & M Constructors, Inc. v. Foley Co.*, 959 F.2d 97, 98 (8th Cir. 1992), because "an injunction cannot issue if there is no chance of success on the merits," *Mid-Am. Real Est. Co. v. Iowa Realty Co.*, 406 F.3d 969, 972 (8th Cir. 2005). When a party seeks to enjoin a government regulation that is "based on presumptively reasoned democratic processes," as we assume the Coalition does here, we apply a "more rigorous threshold showing" than just a "fair chance" of success on the merits. *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 730, 732 (8th Cir. 2008) (en banc). Instead, the Coalition must show it "is likely to prevail on the merits." *Id.* at 732.

-12-

## A. Final Agency Action

As a preliminary matter, the ATF argues the Coalition is unlikely to succeed on the merits because the Final Rule is not a "final agency action." *See* 5 U.S.C. § 704 (subjecting "final agency action" to judicial review). The ATF claims it is not attempting to make "positive law," *see Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997), but simply is introducing an interpretive rule, which merely "clarifies or explains existing law or regulations[,]" *McKenzie v. Bowen*, 787 F.2d 1216, 1222 (8th Cir. 1986). If that is true, then the Coalition cannot prevail on its APA claim.

The Supreme Court's two-prong test from *Bennett v. Spear*, 520 U.S. 154 (1997), "remains finality's touchstone." *Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 635 (D.C. Cir. 2019). For an agency action to be "final" under the APA, the action must (1) "mark the consummation of the agency's decisionmaking process," and (2) "be one by which rights or obligations have been determined, or from which legal consequences will flow." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016) (quoting *Bennett*, 520 U.S. at 177–78). The ATF concedes the Final Rule was the consummation of its decisionmaking process, so we must examine *Bennett*'s second prong.

Under that prong, the Final Rule "must inflict some legal injury upon the party seeking judicial review," in that it "either compel[s] affirmative action or prohibit[s] otherwise lawful action." *Sisseton-Wahpeton Oyate of Lake Traverse Rsrv. v. U.S. Corps of Eng'rs*, 888 F.3d 906, 915 (8th Cir. 2018). In *Hawkes Co. v. U.S. Army Corps of Engineers*, we delineated instances when agency action determined "rights or obligations" under *Bennett*'s second prong. 782 F.3d 994, 1000 (8th Cir. 2015), *aff'd*, 578 U.S. 590 (discussing *Bennett*, 520 U.S. at 158, 178). For example, when an agency requires parties "incur substantial compliance costs . . . , forego what they assert is lawful use of their property, or risk substantial enforcement penalties." *Id.*

-13-

Here, we determine the Final Rule satisfies *Bennett*'s second prong. The Final Rule represents a sea change in how the ATF evaluates stabilizing braces. It rescinded all previous braced-weapon classifications, declaring them "no longer valid." Final Rule at 6,480. That means the ATF now believes many braced weapons are short-barreled rifles, so anyone possessing one "may have been violating the NFA by possessing an unregistered rifle," including those parties who relied on the ATF's prior classification letters in believing they were complying with the NFA. *See id.* The consequence of the ATF's about-face is that many individuals, relying on the ATF's previous classifications, were apparently committing felonies for years by possessing braced weapons. Accordingly, they must take one of the five compliance steps—including paying a tax, or otherwise surrendering or destroying their weapon (their property)—or risk prosecution.

This analysis is supported by the Supreme Court's recent decision in *Garland v. Cargill*, 602 U.S. 406 (2024), which was decided while this case was pending appeal. In *Cargill*, a plaintiff sued under the APA to challenge an ATF rule that reinterpreted the term "machinegun," as defined by the NFA in 26 U.S.C. § 5845(b), to include weapons equipped with bump stocks. *Id.* at 414–15. The Supreme Court clearly treated the ATF interpretive rule as a final agency action because the Court held the ATF exceeded its statutory authority and affirmed the Fifth Circuit's judgment against the ATF. *See id.* at 427–29. It was true in *Cargill* and it is true here: the Final Rule is a final agency action subject to judicial review.

## B. Likelihood of Success on the Merits

We turn to the Coalition's arguments as to why it is likely to succeed on the merits.[12] Though the Coalition argued the Final Rule violated multiple aspects of

---

[12]The Coalition claims the Final Rule wrongly interprets the NFA and GCA, or those statutes are so ambiguous that the rules of lenity and constitutional avoidance require interpreting the statutes to exempt braced weapons from their definition of firearms. Recognizing we "exercise [our] independent judgment in deciding whether an agency has acted within its statutory authority, as the APA

-14-

the APA, it suffices to address only its arguments that (1) aspects of the Final Rule's two-step test, including its multifactor component, are arbitrary and capricious and (2) the Slideshows represent arbitrary and capricious adjudications without explanation.[13] We "review de novo a district court's decision on whether an agency action violates the APA," including an arbitrary-and-capricious challenge. *Friends of the Norbeck v. U.S. Forest Serv.*, 661 F.3d 969, 975 (8th Cir. 2011).

Under the APA, a reviewing court sets aside an agency action if that action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). "A court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Id.* This standard is highly deferential to the agency, providing a narrow standard of review. *Org. for Competitive Mkts. v. U.S. Dep't of Agric.*, 912 F.3d 455, 459 (8th Cir. 2018). As we have explained, a decision is arbitrary and capricious if:

---

requires," *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024) (overruling *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984)), we still decline to address the Coalition's statutory-interpretation argument at this stage because it is likely to succeed on its APA challenge.

[13]Notably, the Coalition does not argue the Final Rule fails the "logical-outgrowth" rule. The logical-outgrowth rule requires "that the final rule the agency adopts . . . be a logical outgrowth of the rule proposed." *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007) (cleaned up). "If the logical-outgrowth requirement is not satisfied, a court must set aside the agency action found to be 'without observance of procedure required by law.'" *Mock*, 75 F.4th at 583 (quoting 5 U.S.C. § 706(2)(D)). In *Mock*, the Fifth Circuit agreed with the plaintiffs that they were likely to prevail on their argument that the Final Rule failed the logical outgrowth-requirement: the Proposed Rule (with its point-based Worksheet 4999) bore little resemblance to the Final Rule (with its multifactor test), so that the "plaintiffs were not on notice, nor could they comment on the expanded rule." *Id.* at 583, 586. But here, the Coalition disclaimed any logical-outgrowth argument. Nor does the Coalition make out a constitutional challenge to the Final Rule.

the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise

*McClung v. Paul*, 788 F.3d 822, 828 (8th Cir. 2015) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Ins. Co.*, 463 U.S. 29, 43 (1983)).  Nor can we uphold agency action that is internally inconsistent or not reasonable and reasonably explained.  *See ANR Storage Co. v. F.E.R.C.*, 904 F.3d 1020, 1024 (D.C. Cir. 2018).

### i. The Rear Surface Area Step

The Final Rule's first step requires examining a "weapon that is equipped with an accessory, component, or other rearward attachment (e.g., a 'stabilizing brace')" to see if it "provides *surface area* that allows the weapon to be fired from the shoulder . . . ."  Final Rule at 6,575 (emphasis added).  *Accord* 27 C.F.R. § 479.11. The Coalition alleges this step is arbitrary and capricious because the ATF refused to include more specific metrics on the minimum surface area required for shouldering.  We agree with the Coalition.

In promulgating the Final Rule, the ATF decided it was not "appropriate or necessary to specify a quantifiable metric for what constitutes surface area that allows for shouldering of the weapon."  Final Rule at 6,529.  Nor did it plan on providing any "minimum surface area," which would comply with the Final Rule. *Id.*  Instead, the ATF explained it will "consider whether there is any surface area on the firearm that can be used to shoulder fire the weapon," *id.* at 6,529, and if so, proceed to step two's six-factor test.  This, despite commenters asking the ATF to clarify "what amount of material is 'minimal' or 'added'" so that "the rear surface area is useful for shouldering."  *Id.* at 6,521–22.  The ATF informs us it "reasonably chose to avoid brightline rules subject to easy circumvention" in favor of an undefined standard.   The problem is the Final Rule does not explain how providing

any amount of mathematical guidance, never mind bright-line mathematical rules, was likely to lead to circumvention of the law. Such guesswork fails to create an identifiable metric that members of the public can use to assess whether their weapon falls within the Final Rule's definition of a "rifle."

In an analogous case, the D.C. Circuit held an ATF determination that a hobby-rocket fuel "deflagrates" was arbitrary and capricious because the ATF "never provided a clear and coherent explanation for its classification of [the fuel]" nor did it "articulate[] the standards that guided its analysis." *Tripoli Rocketry Ass'n, Inc. v. ATF*, 437 F.3d 75, 81 (D.C. Cir. 2006). In *Tripoli Rocketry*, the ATF classified a material as an "explosive" if it "functions by detonation or deflagration." *Id.* at 77. The ATF determined whether a material "deflagrates" by looking at the speed at which the material burns. *Id.* ("[U]nder [the ATF's] characterization, a substance that deflagrates burns more rapidly than something that simply burns (like paper or a candle wick), but less rapidly than something that detonates (like dynamite)."). The ATF determined that because a certain hobby-rocket fuel deflagrates, it was thus subject to regulation. *See id.* at 80. The ATF *could* have mathematically defined the rate of "deflagration" by defining the speed at which a thing burns—just as the ATF could mathematically define the rear surface area that allows for shouldering a weapon—but the ATF "never reveal[ed] how it determines that a material deflagrates," nor did it even try to define "a range of velocities within which materials will be considered to deflagrate." *Id.* at 81.

Expounding on the tension between providing agency flexibility on the one hand and regulable precision on the other, the D.C. Circuit explained:

> We understand that it may be necessary for [the ATF] to define a range flexibly, accounting for gray areas where expert discretion is necessary to characterize a particular substance. But, as a reviewing court, we require *some* metric for classifying materials not specifically enumerated in the statute, especially when, as here, the agency has not claimed that it is impossible to be more precise in revealing the basis upon which it has made a scientific determination. Yet, in this case,

-17-

[the ATF] has provided virtually nothing to allow the court to determine whether its judgment reflects reasoned decisionmaking.

*Id.* Ultimately, the *Tripoli Rocketry* court held the determination to be arbitrary and capricious. *See id.* at 84. A similar problem arises in this case, when the ATF claims the right to make an "unbounded comparative analysis," while "insist[ing] it ha[s] no burden to make more particularized findings." *Id.* at 82. The ATF does not deny it could provide some range of flexibility in explaining the total surface area that allows for shouldering a weapon, but it does not want to, citing the need to prevent circumvention of the law.

This lack-of-metrics issue is compounded by ATF acknowledging that "a majority" of braced weapons would have a surface area that allows a user to shoulder the weapon. Final Rule at 6,529. By the ATF's own estimation, 99% of braced weapons are "rifles" under the NFA and GCA, not just a simple "majority." Likewise, the ATF did not identify a single braced weapon with a surface area that would *not* allow the weapon to be shoulder fired. Rather than specify what kind of brace could pass muster, the ATF posits that a stabilizing brace could hypothetically "include a feature intended specifically to prevent shooting the firearm from the shoulder" or otherwise "prevents shouldering." *Id.* at 6,530. "A potential example of such a feature" could include a "permanently attached protrusion that would dig into a shooter's shoulder should the firearm be fired from the shoulder." *Id.* But providing this "potential" example is little guarantee to braced-weapon manufacturers and possessors who risk felony convictions if the ATF deems the potential protrusion provides *just enough* surface area to shoulder fire a weapon.

Thus, the Coalition is likely to succeed on the merits of its argument that this step is arbitrary and capricious; the ATF "has articulated no standard whatsoever for determining" when a stabilizing brace's rear surface area would allow the shouldering of a weapon. *See Tripoli Rocketry*, 537 F.3d at 84. That the regulated parties wish to see more specific metrics does not mean they wish to skirt or circumvent the law, as ATF insinuates. They may simply wish to comply with the

law, by producing or equipping stabilizing braces that do not have a rear surface area that allows for shoulder firing a weapon.

## ii. The Marketing and Community-Use Factors

If the ATF determines a weapon "provides surface area that allows the weapon to be fired from the shoulder," it proceeds to the second inquiry: analyzing the weapon under six other factors to determine if it is objectively "designed, made, and intended to be fired from the shoulder." Final Rule at 6,575. The Coalition alleges the fifth and sixth factors are arbitrary and capricious. Factor 5 is "[t]he manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon" (the marketing factor) and factor 6 is "[i]nformation demonstrating the likely use of the weapon in the general community" (the community-use factor). *Id.* The Coalition argued these factors "do[] not explain how ATF will assess this information, permitting the agency to reach arbitrary and capricious results." The district court did not discuss its view on these factors, instead believing the multifactor test, as a whole, was within the realm of reasonableness.

Before we analyze any alleged deficiencies in the multifactor test, it is important to understand the problem the Final Rule is trying to solve. The ATF believes that some devices marketed as "stabilizing braces" are being used as shoulder stocks, thus circumventing the law. Whereas a heavy pistol attached with a shoulder stock was a "short-barreled rifle," a heavy pistol attached with a stabilizing brace (which could functionally be used as a shoulder stock) was exempted from regulation. The ATF resolved to examine other objective factors to determine whether a braced weapon was intended to be shoulder fired. *See Posters 'N' Things, Ltd. v. United States*, 511 U.S. 513, 519–21 (1994) (noting "actual use of the item in the community" and a "product's likely use" factor into what purpose an item is "primarily intended" to serve). As it explained:

> Where ATF's evaluation of a submitted [braced weapon] demonstrates that the objective design features of the firearm, as configured, do not support the manufacturer's purported intent and . . . suggest a different intent, then ATF may conclude that the firearm ought not be classified on the basis of the manufacturer's purported intent, thus ensuring effective enforcement of Federal law.

Final Rule at 6,495.

Hence, the need for the ATF to look at other objective factors to determine whether a braced weapon's overall design reveals an intent to allow for shouldering the weapon. Two of those factors include the marketing and community-use factors. As to the marketing factor, the ATF considers "the marketing of the attachment (e.g., indirect marketing through persons that manufacture or sell 'stabilizing braces' but not firearms) and the direct marketing from the firearm manufacturer regarding the firearm to which the attachment or 'brace' is assembled . . . ." *Id.* at 6,544. The ATF will examine the manufacturer's direct and indirect marketing materials to see if they "directly contradict[] the purpose they stated to ATF when submitting the firearm and indicate[] that the firearm, in reality, is intended to be fired from the shoulder." *See id.* "Indirect marketing materials can include statements from accessories manufacturers for the accessories that a firearms manufacturer attaches or incorporates into its firearm, such as a 'brace' manufacturer that advertises that a 'stabilizing brace' is a method to circumvent the NFA." *Id.*

As an example of probative, indirect marketing materials, the Final Rule included a screenshot of SB Tactical's website's homepage:



SB Tactical's Homepage from June 2017 to May 2019 (background picture since changed but the phrase *"Stiff-Arm the Establishment"* was visible during that entire timeframe)

*Id.* at 6,545. The homepage tells the reader to "BRACE YOURSELF" and "STIFF-ARM THE ESTABLISHMENT." *Id.* The ATF concluded the homepage showed that SB Tactical was marketing its stabilizing braces as "a way to avoid NFA controls and to 'Stiff Arm the Establishment.'" *Id.* at 6,544. SB Tactical insists that "stiff arm" innocently "refers to 'the one-handed precision stance' that ATF concedes it had deemed NFA-compliant before its recent reversals." Even if this justification is fanciful, it does reveal a flaw with the marketing factor: neither the Final Rule nor the ATF address how they will evaluate alternative explanations for the same marketing materials.

The community-use factor is even more amorphous. The ATF will consider "information demonstrating the likely use of the weapon by the general community, including both the manufacturer's stated intent when submitting its item for classification and use by members of the firearms industry, firearms writers, and in the general community." *Id.* at 6,544. Not only are these terms vague (who comprises this "general community" and how will the ATF evaluate them?), but the community-use factor relies on circular reasoning: "the likely use of the weapon by the general community" is determined by its "use . . . in the general community."

-21-

*Id.* That tells the reader nothing about how the ATF will evaluate community use under the Final Rule, allowing the ATF to reach any decision it wishes by only looking to specific evidence of community misuse, while ignoring any other examples of the community's compliant use.

Furthermore, the community-use factor provides no metrics by which the ATF deems different community displays to be "representative" of community use. Take, as an example, the Final Rule's use of online videos to determine how the "community" uses a weapon. The ATF analyzed "[n]umerous videos . . . demonstrat[ing] individuals using the . . . 'stabilizing brace' from the shoulder." *Id.* at 6,506. And in "one video," an individual said he believed the stabilizing brace was for shouldering weapons. *Id.* Based on these examples, the ATF concluded these braced weapons had objective design features indicating they should be classified as short-barreled rifles. *See id.* The problem with this reasoning is that the ATF takes videos of individuals shoulder-firing braced weapons as representative of how all individuals use braced weapons. How will the ATF weigh different examples of community use if, say, Cicero posted a video of himself properly firing a braced weapon without shouldering it, while another individual posted a video of himself shoulder firing the braced weapon? The Final Rule gives no indication how the ATF will determine different community displays to be "representative" of community use.

Finally, because the marketing and community-use factors require analyzing third parties' intent and attributing their intent to any individual who affixes a stabilizing brace to a weapon, the Final Rule "would hold citizens criminally liable for the actions of others, who are likely unknown, unaffiliated, and uncontrollable by the person being regulated." *Mock*, 75 F.4th at 586; *see also id.* at 586 n.56 (The ATF "considered and explicitly rejected" an approach allowing it to systematically adjudicate stabilizing braces, instead preferring to adjudicate braces "on an entirely *ad hoc* basis."). On the one hand, the ATF claims a "single individual" in "isolated circumstances" is irrelevant in determining whether a braced weapon is intended to be shoulder fired. *See* Final Rule at 6,519. On the other hand, the ATF *will* consider

"isolated circumstances" to be probative of intent should those isolated circumstances reveal an intent to use the braced weapon as a rifle. Which is it?

We conclude the Coalition is likely to succeed on its arguments that the marketing and community-use factors are arbitrary and capricious because they are internally inconsistent, "fail[] to provide an intelligible explanation," and "amount[] to a failure to engage in reasoned decisionmaking . . . ." *Constellation Mystic Power, LLC v. FERC*, 45 F.4th 1028, 1057 (D.C. Cir. 2022) (quoting *FPL Energy Marcus Hook, L.P. v. FERC*, 430 F.3d 441, 448 (D.C. Cir. 2005)); *see also Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 59 (D.C. Cir. 2015) (collecting cases and noting the court "ha[s] often declined to affirm an agency decision if there are unexplained inconsistencies in the final rule"). An agency may promulgate a "holistic, multi-factor, weight-of-the-evidence test," but only if that test "define[s] and explain[s] the criteria the agency is applying." *Miss. Comm'n on Env't Quality v. E.P.A.*, 790 F.3d 138, 150 (D.C. Cir. 2015) (internal quotation marks and citation omitted). The Final Rule misses that mark. Rather, the Final Rule makes it "nigh impossible for a regular citizen to determine what constitutes a braced pistol, and . . . whether a specified braced pistol requires NFA registration." *Mock*, 75 F.4th at 584–85. For those reasons, the Final Rule is arbitrary and capricious.

### iii. The Accompanying Slideshows

The Coalition also makes two arguments as to the contemporaneously released Slideshows. First, the Coalition argues these Slideshows represent final agency actions because they actually judge weapons to be "short-barreled rifles." Because the Slideshow adjudications do not provide a reasoned explanation for the weapon classifications, the Coalition argues they fail the APA's procedural requirement that the ATF "provide a reasoned explanation for its action." *See DHS v. Regents of the U. of Cal.*, 591 U.S. 1, 35 (2020). Second, the Coalition argues the Slideshows evince that the Final Rule is arbitrary and capricious because it "allow[s] ATF to reach whatever result it wants." We agree with both contentions.

The ATF argues the Slideshows are not final agency actions because they "have no legal consequences." The Slideshows are merely meant to "inform members of the public of how they might be impacted" by the Final Rule's future application. Final Rule at 6,514. The district court agreed, concluding the Slideshows only "forecast[] the ATF's position on particular weapons . . . ." But one need not look further than the opening slides of either Slideshow to see they represent the ATF's judgments. Both Slideshows purport to show photos of weapons that "*are* short-barreled rifles."[14] And the Final Rule commands "action such as registration in the [National Firearms Registration and Transfer Record] will need to be taken . . . ." *Id.* at 6,514. We take the Slideshows at their word; the ATF judged the pictured weapons to be short-barreled rifles, which carries direct and appreciable legal consequences. *See Hawkes*, 578 U.S. at 597 (An agency action is "final" if it determines rights and obligations or engenders legal consequences.).

Even though the Slideshows are adjudicatory, they are devoid of any explanation as to how the ATF applied the Final Rule to the pictured weapons. The ATF insinuates the Coalition bears the burden to prove the pictured weapons should *not* be classified as short-barreled rifles—an impossible task for anyone, including this court, considering the ATF refuses to give any sort of guidance as to how it evaluates each factor. The ATF's burden-inverting argument makes as much sense as shouldering a rifle by the barrel: "The reasoned explanation requirement of administrative law, after all, is meant to ensure that *agencies* offer genuine justifications for important decisions" so the reviewing court and public may scrutinize those decisions—not the other way around. *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (emphasis added). "Accepting contrived reasons would defeat the purpose of the enterprise." *Id.*; *see also LeMoyne-Owen Coll. v. N.L.R.B.*, 357 F.3d 55, 61 (D.C. Cir. 2004) (holding agencies must explain how they weigh factors). Because they lack any such explanation, the Slideshows "cannot carry the

---

[14]*Supra* notes 8–9; Appendix A & B.

force of law." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (citing 5 U.S.C. § 706(2)(A)).[15]

The irony in this conclusion is that because the Slideshows cannot act as judgments, then they exist to provide the public notice of how the ATF might classify the pictured weapons, which is what the ATF claimed the Slideshows were meant to do in any event. So, the Slideshows represent no more than the firing of a warning shot. But the above discussion also reveals that the Final Rule, as a whole, is arbitrary and capricious because it allows the ATF to arrive at whatever conclusion it wishes without "adequately explain[ing] the standard on which its decision is based . . . ." *See Kearney Reg'l Med. Ctr., LLC v. U.S. Dep't of Health & Hum. Servs.*, 934 F.3d 812, 816 (8th Cir. 2019). "An agency must defend its actions based on the reasons it gave *when it acted.*" *Regents*, 591 U.S. at 24 (emphasis added). Such explanations are necessary to give guidance on how the ATF is likely to apply the Final Rule in future instances. *See LeMoyne-Owen*, 357 F.3d at 61 (quoting *Fastener Co. v. Stanley Works*, 59 F.3d 384, 400 (2d Cir. 1995)) (noting "'thorough, careful, and consistent application' of a multi-factor test is important" for drawing factual distinctions "because 'appellate courts depend on [agency explanations] for the performance of their assigned task of review'"). That the Slideshows judged the weapons without explanation reveals the Final Rule's arbitrary and capricious nature. Thus, we conclude the Coalition is likely to succeed on the merits of its challenge to the Slideshows, and the Slideshows also evince the Final Rule is arbitrary and capricious.

---

[15]The ATF claims that it fully intends to "follow up" the Slideshows with "detailed classification letters explaining each determination," and that any remedy for improper agency action would simply be to "remand any unexplained conclusions to the agency for further explanation or reconsideration." This is much like shooting the side of a barn, drawing the target around the bullet holes, and then proclaiming, "bullseye!" Agency actions require "contemporaneous explanations," and not just post hoc justifications "raised in court by those appearing on behalf of the agency or by agency officials themselves." *Regents*, 591 U.S. at 23. The ATF's act-now-and-justify-later decisionmaking is exactly the kind of post hoc rationalizing that cannot sustain its unexplained actions.

## C. Injunctive Relief

The district court declined to address the remaining injunctive factors, and we typically do not address other factors "for the first time on appeal, for '[t]he district court is in the best position to evaluate all of the evidence and weigh the factors to determine whether the injunction should issue.'" *Powell v. Noble*, 798 F.3d 690, 703 (8th Cir. 2015) (alteration in original) (quoting *Lankford v. Sherman*, 451 F.3d 496, 513 (8th Cir. 2006)). Because we hold the Coalition is likely to succeed on the merits, it was abuse of discretion to deny an injunction based solely on that factor.

We note that while this appeal was pending, a district court in the Northern District of Texas—per the Fifth Circuit's remand from *Mock*, 75 F.4th at 588—held the Final Rule violated the APA and ordered it be vacated. *Mock v. Garland*, No. 4:23-CV-00095-O, 2024 WL 2982056, at *6 (N.D. Tex. June 13, 2024). The Fifth Circuit consolidated that order with other appeals and scheduled oral argument for September 2024. *See Watterson v. ATF*, No. 23-40556 (5th Cir. 2023). Though the district court's vacatur and appeal thereof bear on the necessity of injunctive relief, *see Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010) (suggesting an injunction may be warranted if vacatur does not sufficiently redress the plaintiff's injury), the district court is best suited to determine to what extent injunctive relief remains necessary, *see Roberts v. Van Buren Pub. Schs.*, 731 F.2d 523, 526 (8th Cir. 1984).

## III. Conclusion

We reverse the order denying a preliminary injunction and remand with instructions to reconsider the motion consistent with this opinion.

SHEPHERD, Circuit Judge, dissenting.

During the pendency of this appeal, the Northern District of Texas vacated the Final Rule. Ante at 26 (citing Mock v. Garland, No. 23-CV-00095, 2024 WL

-26-

2982056, at \*6 (N.D. Tex. June 13, 2024)).  "Vacatur . . . is a universal remedy" that "caus[es] the rule to lose binding force."  John Harrison, Vacatur of Rules Under the Administrative Procedure Act, 40 Yale J. on Regul. Bull. 119, 119 (2023).  Accordingly, there is now "no [Final R]ule . . . in place to enforce against anyone."  Mila Sohoni, The Power to Vacate a Rule, 88 Geo. Wash. L. Rev. 1121, 1122 (2020).

I therefore see no need to *preliminarily* enjoin the enforcement of the now-vacated Final Rule and would affirm the district court's order on that basis alone.  See Ronald M. Levin, Vacatur, Nationwide Injunctions, and the Evolving APA, 98 Notre Dame L. Rev. 1997, 1999 (2023) ("In functional terms . . . a vacatur can have roughly the same effects as a nationwide injunction."); cf. Braidwood Mgmt., Inc. v. Becerra, 104 F.4th 930, 953-55 (5th Cir. 2024) (concluding that there was no basis for a nationwide injunction against final agency actions given that there was no support for vacatur of those actions, and concluding that the district court abused its discretion in "enter[ing] universal injunctive relief after already providing complete relief to the plaintiffs [by vacating the actions]").

The majority concludes otherwise, relying on Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139 (2010).  But that decision does not support the majority's charted course.  In Monsanto, plaintiff farmers and environmental groups challenged the Animal and Plant Health Inspection Service's (APHIS) decision to "unconditionally" deregulate a genetically engineered crop—Roundup Ready Alfalfa (RRA)—without first completing an environmental impact statement (EIS), in violation of the National Environmental Policy Act of 1969 (NEPA).  Id. at 144-46.  The plaintiffs argued that they were injured by the deregulation because the planting of RRA would likely genetically contaminate their conventional, organic alfalfa.  Id. at 153 & n.3, 160.  The district court concluded "that the deregulation decision ran afoul of NEPA" and subsequently allowed petitioners Monsanto and others to intervene in the remedial phase of the lawsuit.  Id. at 147.  Ultimately, the district court entered a permanent injunction and judgment that

(1) vacated APHIS's deregulation decision; (2) ordered APHIS to prepare an EIS before it made any decision on Monsanto's deregulation petition; (3) enjoined the planting of any RRA in the United States after March 30, 2007, pending APHIS's completion of the required EIS; and (4) imposed certain conditions (suggested by APHIS) on the handling and identification of already-planted RRA.

Id. at 148. The petitioners appealed, challenging the scope of that relief but not disputing that a NEPA violation had occurred. Id.

Addressing the relief's propriety, the Supreme Court "assume[d] without deciding that the District Court acted lawfully in vacating the deregulation decision," id. at 156, but concluded that the district court erred in enjoining *limited* deregulation of RRA "during the pendency of the EIS process," id. at 164, because "applicable regulations allow [APHIS] to take at least some action in furtherance of th[e] propos[ed deregulation] while the EIS is being prepared," id. at 145. From this conclusion, it followed that the district court's "broad injunction against planting" was also "inappropriate." Id. at 165. As the Court explained, "[i]f APHIS may *partially* deregulate RRA before preparing a full-blown EIS . . . farmers should be able to grow and sell RRA in accordance with that agency determination." Id. (emphasis added).

It is against these highly specific facts that the Supreme Court "suggest[ed]", ante at 26, that the "extraordinary relief of an injunction" may be necessary to "redress [plaintiffs'] injury," in "addition[]" to the "vacatur of APHIS's deregulation decision"—vacatur which ought to have left open the possibility of *partial* deregulation and further planting of RRA. Monsanto, 561 U.S. at 165-66. But here, no party suggests that the Government will enforce the Final Rule against the Coalition despite its vacatur. No party points to injuries that the Coalition will suffer without a preliminary injunction now that the Final Rule has been vacated. Nor does the Coalition seek an injunction preventing the ATF from pursuing future regulation of braced-pistols apart from the Final Rule. R. Doc. 1, at 40; cf. United States v. Texas, 599 U.S. 670, 693 (2023) (Gorsuch, J., concurring in the judgment) ("[T]he

-28-

only injunction [the respondent-States] seek is one barring 'implementation and enforcement' of the Guidelines—essentially an injunction imitating a vacatur order." (citation omitted)).  "Because courts presume that the federal government will comply with [their] rulings, . . . injunctive relief is unnecessary . . . ." <u>Mock</u>, 2024 WL 2982056, at *6.  I respectfully dissent.

_____

**Appendix A.**




000001

**AR-type Firearm with SBA4 Attached – Short-barreled Rifle**





000003

## Glock-type Firearm with FLUX Attached – Short-barreled Rifle





000016

## AK-type Firearm with AKTF Attached – Short-barreled Rifle





000026

**Appendix B.**



**U.S. Department of Justice**
**Bureau of Alcohol, Tobacco, Firearms and Explosives**

# Commercially available firearms equipped with a "stabilizing brace" that are short-barreled rifles*

*May not be marketed by original manufacturer in displayed configuration, rather a wholesaler or retailer

This is not an exhaustive list of commercially available firearms equipped with a "stabilizing brace" that are short-barreled rifles. However, this list is representative of how ATF will apply the definition of "rifle" to firearms that are equipped with a "stabilizing brace." For purposes of this document, the term "short-barreled rifle" is used to refer to rifles with a barrel or barrels of less than sixteen inches, that are subject to the provisions of the NFA.



000001

## Q, model Honey Badger with HBPDW Attached – Short-barreled Rifle





000004

## Palmetto State Armory, model AKV with AKTF Attached – Short-barreled Rifle





000020

## H&K, model SP5 with Gear Head Mod1 Tailhook Attached – Short-barreled Rifle





000023